## CONSOLIDATED PIPE LINE CO. v. BRITISH AMERICAN OIL CO., Ltd.

No. 20999. Opinion Filed Apr. 11, 1933.

Rehearing Denied May 9, 1933.

Poe, Lundy & Morgan and H. R. Duncan, for plaintiff in error.

Rollin E. Gish and Biddison, Campbell, Biddison & Cantrell, for defendant in error.

BUSBY, J. This is an appeal from a judgment of the district court of Tulsa county, Okla. The action was commenced in the trial court by the defendant in error, British American Oil Company, Ltd., as plaintiff therein. The action was based on an alleged breach of contract for the sale of crude oil when the plaintiff sought to recover general and special damages for breach of contract for failure to deliver such oil in accordance with the contract. The cause was tried to the court and the judgment rendered in favor of the plaintiff and against the defendant for the sum of $13,770.28, together with costs. The parties will be referred to as they appeared in the trial court.

An examination of the record discloses that the plaintiff, British American Oil Company, Limited, is a foreign corporation existing under the laws of the Dominion of Canada, and that its principal place of business is in the city of Toronto, Canada; that the plaintiff has not qualified to do business within the state of Oklahoma as a foreign corporation and has not complied with the laws of this state with reference to domestication. The defendant, Consolidated Pipe Line Company, is also a foreign corporation, but has qualified to do business in the state of Oklahoma, maintaining its office at Tulsa, Okla.

On the 10th day of December, 1923, one J. C. Millar, acting as agent for the plaintiff, placed a verbal order with the defendant, Consolidated Pipe Line Company, which was represented in the transaction by its

president and agent, R. P. Kistler, for the purchase of 15,000 barrels of crude oil from the Okmulgee district, said crude oil to be of approximately 38 gravity and to be paid for on the basis of $1.25 per barrel, loaded into the cars of the plaintiff at Sapulpa, Okla. This order was accepted by the defendant, and thereafter, on the 11th day of December, 1923, a written memorandum of such order was executed in behalf of the respective corporations by their respective agents. This memorandum was in the form of a letter, and read as follows:

"December 11, 1923,
"Consolidated Pipe Line Company,
    "Tulsa, Oklahoma.
        "Attention Mr. Kistler:
"Gentlemen:

"This will confirm verbal order placed with you yesterday for 15,000 barrels, approximately 38 gravity, Okmulgee district crude to be shipped in our cars as fast as possible on a basis of $1.25 per barrel loaded.

"I have received advice from our office that sufficient cars are en route and should arrive Sapulpa between the 18th and 21st.

"It is agreed that all cars necessary for shipment will be at Sapulpa before January 18th, and for such quantity as cars have not been received at Sapulpa by January 18th, this quantity is to be considered canceled.
            "Yours very truly,
            "British American Oil Company,
            "Signed by J. C. Millar."
"Accepted:
    "Consolidated Pipe Line Company,
    "Signed by R. P. Kistler."

It appears that at the time this memorandum of agreement was made, the defendant had made arrangements to procure the oil to fill the order from the Gladys Belle Oil Company. The Gladys Belle Oil Company had its oil in storage with the Sapulpa Refining Company. Subsequent to the execution of the memorandum agreement above set forth, the Sapulpa Refining Company exercised an option to take the oil from the Gladys Belle Oil Company, and the Gladys Belle Oil Company in turn refused to supply the oil to the defendant. On December 21, 1923, the defendant advised the plaintiff by telegram of their inability to obtain the oil to fill the contract, that telegram reading as follows:

"Tulsa, Oklahoma.
"December 21, 1923,
"British American Oil Company,
    "Toronto, Ontario, Canada.

"Receivers for Sapulpa Refining Company against our protest on nineteenth took our crude under option written in their storage agreement. Have not yet located crude elsewhere. Are making every effort.
        "Consolidated Pipe Line Company"
"Str. message Chg."

In response to this telegram, the plaintiff replied by telegram as follows:

        "Canadian National Telegram
            "Toronto, December 21st, 1923.
"Mr. R. P. Kistler,
    "Consolidated Pipe Line Co.,
        "Tulsa, Okla.

"Your telegram received. You have sold us fifteen thousand barrels Okmulgee crude certain specifications and we have either at Sapulpa or in immediate vicinity entire equipment for moving of this crude and demand immediately delivery of same. In view of your telegram will charge you with car rental from date of arrival of cars until loaded and cars must be loaded prior to January first.

"J. C. Millar, charge account of the British American Oil Co., Limited."

On the following date the defendant advised the plaintiff by telegram that it would not fill their order, the telegram reading as follows:

        "Canadian National Telegram
"OB Tulsa Okla 1249 P M 22
"B Amn Oil Co
    "Toronto

"No delivery of any part of fifteen thousand barrels of oil will be made under letter of December eleventh, nineteen hundred twenty three.
        "Consolidated Pipe Line Co."

By contract made January 26, 1924, plaintiff procured oil from other sources in lieu of the oil which it had intended to procure by virtue of the order from the defendant. In the meantime oil had advanced in price, and the oil which plaintiff obtained cost the sum of $2.08½ per barrel, inclusive of loading costs. On the 13th day of December, 1927, plaintiff commenced this action to recover general damages for the difference in

price of the oil contracted for and the oil purchased, claiming the sum of $12,525 actual damages and $2,285.72 special damages for the loss of use of its tank cars. The defendant answered by way of general denial, admitting, however, that the memorandum bearing date of December 11, 1923, was signed by R. P. Kistler, but pleading in this connection that he was acting as a broker in making the sale, and that acting in this capacity he did not bind the defendant, Consolidated Pipe Line Company. Defendant also alleged that the contract was not binding for the reason that it was unilateral, and that by its terms no obligation to take the oil rested on the plaintiff. The defendant also alleged that the telegram from the plaintiff bearing date of December 21st, wherein the plaintiff demanded delivery on or before January 1st, and advised the defendant that it would make charges for rental on its cars, constituted a breach of contract by the plaintiff and relieved the defendant from any liability which might have previously existed. Defendant also alleged that the market price of crude oil at the time of the breach of the contract was much less than the plaintiff subsequently paid for the same, and that the plaintiff could have obtained a supply of oil at a much lower price than it paid on January 26th. Defendant also pleaded that the cars in connection with which plaintiff sought to recover special damages could have been used by the plaintiff during the time for which the plaintiff was claiming special damages. A reply was filed to this answer, and on the issues joined the case was tried on the 6th day of December, 1928. The cause was taken under advisement by the trial court until May 2, 1929, at which time a general judgment in favor of the plaintiff for the sum of $13,770.28 was rendered. The further facts incidental to the questions involved in this appeal will appear in a subsequent portion of this opinion.

In presenting its appeal to this court, the defendant has incorporated in its petition of error 14 assignments of error. In its brief it groups the argument of the five main propositions, which are:

"1. The plaintiff was doing business in the state of Oklahoma without having complied with the laws relative to foreign corporations, and cannot maintain the action.

"2. The contract relied upon is void and unenforceable for lack of mutuality and for indefiniteness.

"3. The telegram of the plaintiff to the defendant was an anticipatory breach of the contract.

"4. The measure of damages is the difference between the contract price and the market price; (b) If there was a breach this is fixed as of the time of the breach; (c) there can be no recovery for car rentals.

"5. (a) As to any price other than the market price; (b) as to pipe and storage charges paid; (c) as to car rentals; (d) as to evidence of witness Winfield, who attempted to establish the basis for car rentals."

We will consider these various propositions urged in the order in which they appear.

The first contention of the defendant challenges the right of the plaintiff to maintain its suit in the courts of this state without having complied with the laws of the state requiring domestication of foreign corporations. The defendant urges that the plaintiff in connection with this transaction and other similar transactions was doing business within the state of Oklahoma, and that it cannot prosecute this action by reason of the provisions of section 9738, O. S. 1931, which provide:

"No foreign corporation, except created solely for religious or charitable purposes, shall transact business within this state until it shall have filed in the office of the Secretary of State, a certified copy of its charter or articles of incorporation, which shall be recorded in a book to be kept by the Secretary of State for that purpose, and shall have paid the fees required by law."

The defendant also contends that the plaintiff cannot maintain this action by reason of the provisions of sections 130 to 135 O. S. 1931, inclusive, which provide, in substance, that as a prerequisite to doing business within this state a foreign corporation shall designate a residence service agent upon whom service of summons may be had. These sections also provide that a failure to comply with this requirement shall render the contracts with citizens of the state void and they prohibit foreign corporations from maintaining an action in the courts of this state.

In answer to this contention the plaintiff admits that it was conducting business within the state without complying with these statutory provisions, but urges that it is not affected by the provisions of the above statutes for the reason that the business

conducted constituted interstate commerce or was incidental thereto. As a legal basis for the defendant's claim, attention is directed to the terms of section 134, mentioned supra, which reads:

"This article shall not be effective in cases where its enforcement would conflict with the powers of Congress or the federal laws to regulate commerce between the states."

And also to the former decision of this court wherein we have held that the provision of the statute mentioned above does not govern foreign corporations engaged in interstate commerce. Kibby v. Cubie Heimmann & Co., 41 Okla. 116, 137 P. 352; Fruit Dispatch Co. v. Wood, 42 Okla. 79, 142 P. 1138; M. D. Wells Co. v. V. J. Howard & Co., 50 Okla. 776, 151 P. 616. Numerous federal and United States decisions to the same effect are mentioned in the brief. The business conducted by the plaintiff within the state was not restricted to the particular transaction upon which this suit was based, but the transaction involved here is typical of all the others. The plaintiff operated a refinery in Toronto, Canada, and had on numerous occasions purchased crude oil within this state for the purpose of shipping the same to Canada, where it was used in the operation of plaintiff's refinery.

The question to be determined is whether the acts involved in the business transactions by the plaintiff were so closely associated with interstate commerce as to relieve the plaintiff from complying with the Oklahoma law requiring foreign corporations to domesticate and appoint service agents.

In the case of Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 42 Sup. Ct. Rep. 106, 66 L. Ed. 239, the Supreme Court of the United States had a similar problem to decide. It was therein urged that a Tennessee corporation, which from time to time purchased grain in Kentucky to be delivered on board cars and upon delivery to be shipped into Tennessee, must comply with the Kentucky statutes similar to the Oklahoma statutes. The Supreme Court of the United States decided in that case that the Tennessee corporation was engaged in interstate commerce, and the following applicable rules of law appear in the headnotes of the Supreme Court Reporter:

"4. Commerce among the states within Const. art. 1, par. 8, ch. 3, is not confined to transportation from one state to another, but comprehends all commercial intercourse between the different states, and all component parts of such intercourse.

"5. Where goods are purchased in one state for transportation to another, the commerce includes the purchase as well as the transportation.

"6. A corporation of one state may go into another for all legitimate purposes of interstate commerce, without the leave or license of the latter state, and any statute of such state obstructing or laying a burden on the exercise of such privilege is void under the commerce clause.

"7. The purchase of wheat in Kentucky for delivery on board cars at a point in Kentucky was interstate commerce where the buyer in continuance of its earlier practice was purchasing the grain for shipment to its mill in Tennessee, and hence Ky. St. 1915, par. 571, prescribing the conditions on which foreign corporations may do business in Kentucky, was invalid as to such transaction."

Again, in the case of Federal Trade Commission v. Pacific States Paper Trade Association, 71 L. Ed. 534, 47 Sup. Ct. Rep. 255, 273 U. S. 52, the United States Supreme Court defined "interstate commerce" in the opinion, reading:

"Such commerce (interstate) is not confined to transportation, but comprehends all commercial intercourse between different states and all competent parts of that intercourse. And it includes the buying and selling of commodities for shipment from one state to another."

In the case at bar the plaintiff contemplated an immediate shipment of the crude oil to a point outside of this state as soon as it was delivered. A contract to purchase the crude oil and negotiations preliminary thereto were incidental to the act of interstate commerce involved. The situation comes squarely within the rule announced in the Dahnke-Walker Case, supra, and it follows that the plaintiff may maintain this action in the courts of this state without complying with the statutes referring to domestication of foreign corporations.

The defendant next seeks to avoid liability on the theory that the contract between the parties to this litigation was unenforceable for want of mutuality of obligation. This contention is based on the last clause of the written memorandum which provides "For such quantity as cars have not been received at Sapulpa by January 18, this quantity is to be considered canceled."

Want of mutuality of obligation in a contract renders an executory contract unenforceable where such lack of mutuality constitutes a failure of consideration. 6 R. C. L. page 686, par. 93. Obviously it has no particular application to a class of contracts which are executory on the one side and executed on the other, such as is commonly the case with promissory notes and options. Want of mutuality is an important element to be considered in those contracts where the only consideration for the promise of one party is the promise of the other. In such contract, if the promise of one party is drafted in such terms that it fails to bind him, the promise of the other party is unenforceable. The principle involved is clearly stated in 23 R. C. L., page 1264, in paragraph 82 of the article on sales:

"These general principles" (concerning mutuality of obligation in contracts) "fully apply with regard to an executory contract of sale, and in case of such a contract the only consideration of which on the one side is the offer or agreement to sell and on the other the offer or agreement to buy, the obligation of the parties to sell and to buy must be mutual to render the contract binding upon either party. When there are negotiations in reference to a sale, they must be such as will bind both parties, or neither will be bound. Unless both are so bound that either could maintain an action against the other for breach, neither will be bound."

The rule may be somewhat tersely stated that a contract is unenforceable for want of mutuality if one of the parties has a "free way out." That is, if one of the parties, not having suffered any previous detriment, can escape future liability under the contract, that party may be said to have a "free way out" and the contract lacks mutuality.

It is the contention of the defendant that the contract in this case is so drafted that the plaintiff could have escaped liability by merely failing to furnish the required cars to transport the crude oil. In other words, that the performance of the contract depended on the future decision of the plaintiff to furnish or not to furnish cars. If this is the proper interpretation of the agreement of the parties as expressed in the memorandum, the contract was at its inception unenforceable. The plaintiff, however, urges that a different construction should be placed on the agreement. In its brief the plaintiff says: "The provision referred to is evidently one placed there for the benefit of the seller because of the specific agreement of the purchaser to have the cars there, and leaves the seller with the option to cancel if the contract is broken by the buyer."

It will be seen that the decision of the controverted point hinges upon the interpretation of the contract. An analysis of the instrument under consideration discloses that in the portion preceding the cancellation clause mutual definite promises are contained. The memorandum confirms a verbal order for a definite amount of crude oil at a fixed price, thereby implying a definite agreement on the one side to sell and on the other to purchase the stipulated amount of oil at the price recited.

In the agreement the plaintiff definitely agrees to furnish the necessary cars for shipment before January 18th. It will be seen that the contention of the defendant to the effect that the cancellation clause in the contract is sufficient authority for the plaintiff to evade liability by failure to furnish cars places an interpretation on that clause that renders it in direct conflict with and repugnant to the preceding clause of the contract wherein the plaintiff definitely agrees to furnish the necessary cars. On the other hand, the construction urged by the plaintiff that the clause is intended for the benefit of the seller and gives him the right to cancel or not at his option enables us to harmonize the contract and give force and effect to each of the clauses. It seems that this contention is supported by section 5055, C. O. S. 1921, section 9476, O. S. 1931, referring to the interpretation of contracts, which provides:

"Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clause subordinate to the general intent and purposes of the whole contract."

In approving the plaintiff's interpretation of this contract we are greatly influenced by the decision of the United States Supreme Court in the case of William W. Stewart v. Lewis A. Griffith, Executor of Alfred W. Ball, Deceased, 54 L. Ed. 782, 30 Sup. Ct. Rep. 528, 217 U. S. 323. In that case a contract for the sale of land was before the court. By the terms of the instrument there was a definite promise to buy by the purchaser and an agreement to sell by the owner, and in the last part of the instrument the following clause was inserted: "In case the remainder of the first half of the purchase price be not paid on November 7, 1903, then the said $500 so

paid to the said Griffith is to be forfeited and the contract of sale and conveyance to be null and void, and of no effect in law, otherwise to be and remain in force. * * *" The opinion of the court was delivered by Mr. Justice Holmes, who in disposing of the question involved stated:

"The first defense is based on this document itself. It is said that the defendant made no, covenant, and therefore was free to withdraw if he chose to sacrifice the $500 that he had paid. * * *

"Here is an absolute promise in terms which it would be unreasonable to make except on the footing of a similar promise as to the main parcel that the purchaser desired to get. We are satisfied that Stewart bound himself to take the land. See Wilcoxson v. Stitt, 65 Cal. 596, 52 Am. Rep. 310, 4 P. 629; Dana v. St. Paul Invest. Co., 42 Minn. 194, 44 N. W. 55. The condition plainly is for the benefit of the vendor, and hardly less plainly for his benefit alone, except so far as it may have fixed a time when Stewart might have called for performance if he had chosen to do so, which he did not. This being so, the word 'void' means voidable at the vendor's election, and the condition may be insisted upon or waived at his choice."

Applying the foregoing holding to the case at bar, it may appropriately be said that the cancellation clause means that upon failure of the purchaser to furnish the necessary cars the contract might be canceled in part at the election of the vendor. We are, therefore, convinced that mutuality of obligation existed in this contract at its inception, and that it is therefore unnecessary to determine whether lack of mutuality, if it did exist, might have been cured by subsequent furnishing of the necessary cars.

The defendant in its third contention urges that it should be excused from any liability under the contract on the theory that the telegram which it received from the plaintiff on December 21, 1923, constituted an anticipatory breach of the contract. The portion of the telegram referred to reads: "In view of your telegram, will charge you with car rental from date of arrival of cars until loaded and cars must be loaded prior to January first."

It is the claim of the defendant that by virtue of the provision of the memorandum of contract between the parties the defendant had a reasonable time after January 18th to load the cars and that this telegram constituted a positive refusal on the part of the plaintiff to abide by the contract

in that respect; that by demanding performance of the contract by January 1st, the plaintiff shortened the time allowed by the contract and by advising that rental would be charged upon the cars for delay in delivery before January 18th, the plaintiff was in effect reducing the purchase price of the oil fixed by the contract, in that the car rental would be deducted from the contract price. In support of this contention the following excerpt from Williston on Contracts, vol. 2, sec. 855, page 1677, is quoted:

"The same principle of justice which forbids the enforcement of a promise when the counter promise has been broken also forbids enforcement when it is evident that the counter promise will be broken. Prospective failure of consideration is as good an excuse as actual failure."

This statement of law has received previous approval of this court in the case of Waggoner Refining Co. v. Bell Oil & Gas Company, 117 Okla. 55, 244 P. 756. We believe this to be a correct statement of the law. We recognize the principle that one of the parties to a contract may, by positive statement or actions evidencing an intention not to perform, breach a contract before the time of performance has arrived.

The weakness of the defendant's contention, however, is that it is based upon an erroneous interpretation of the contract. The memorandum provides in the first paragraph thereof "that the oil is to be shipped in our cars as fast as possible on a basis of $1.00 per barrel loaded." It seems to us to be apparent from the instrument itself that it was contemplated and agreed by the parties that as soon as the cars were available for the purpose of loading at Sapulpa they should be immediately loaded by the defendant. The subsequent provision of the contract referring to January 18th was a time limit upon the plaintiff within which the plaintiff bound itself to furnish the cars. If the cars had not been furnished until January 18, 1924, the contention of the defendant on this point would be sound. However, the evidence in the case discloses that ample cars were on hand to commence loading at Sapulpa on December the 21st, and there is considerable testimony in the record concerning the time required for loading and supporting the view that was evidently taken by the trial court that these cars could have been loaded in the time between the 21st of December and the 1st of January.

It will thus appear that the telegram

complained of by the defendant was not a renunciation of the contract nor a refusal to abide by its terms, but in view of the fact that cars were available for loading purposes it was in reality a demand for performance in accordance with the terms of the contract plus a statement of intention to demand special damages for delay in loading. There was no act on the part of the plaintiff which defendant could rightfully treat as an anticipatory breach of contract. It is next urged by the defendant that the trial court committed error in determining the amount of damages. The defendant contends that the measure of damages is the difference between the contract price and the market price determined as of the time of the breach of the contract. If this contention is well taken, it would materially reduce the amount which the plaintiff was entitled to recover. Our statute governing the measure of damages in case of a seller's breach of contract to deliver personal property is section 9971, O. S. 1931, which reads:

"The detriment caused by the breach of a seller's agreement to deliver personal property, the price of which has not been fully paid in advance, is deemed to be the excess, if any, of the value of the property to the buyer, over the amount which would have been due to the seller under the contract, if it had been fulfilled."

It will be observed that by the terms of this statute the measure of damages is the difference between the contract price and the value of the property to the buyer. Ordinarily, in the case of commercial commodities such as crude oil, the value of the property to the buyer is deemed to be its market price at the place where the property was to be delivered. However, the market value does not govern where it is impossible to obtain the commodity in the open market. In such a case the value of the property to the buyer is based upon the nearest available market as a basis. As the rule is stated by this court in the case of Gustafson & Spencer, Inc., v. Bell Oil & Gas Co., 106 Okla. 229, 233 P. 708, where this court stated:

"The damages resulting from the breach of a sales contract for the sale of a commercial commodity is ascertained by arriving at the difference between the contract price and the price which must be paid by the purchaser for a like commodity in the open market at the place specified for delivery. If the commodity may not be had in the open market at the place specified for delivery, then the nearest market must be used as a basis for computation, plus the transportation charges from such point to the place specified for delivery."

To the same effect is the case of W. T. Ferguson Lumber Company v. Hiawatha Lumber Company, 105 Okla. 193, 232 P. 67, and as the rule is also announced in the case of Hurley Gasoline Co. v. Johnson Oil Ref. Co., 118 Okla. 26, 246 P. 438, wherein this court said in syllabus 4:

"Where defendant agrees to furnish gasoline of a certain grade at a stipulated price, and breaches his contract and refuses to furnish gasoline of the contract grade or quality, and the plaintiff is required to and does purchase the quantity and quality of gasoline agreed to be furnished by defendant, the plaintiff is entitled to recover the difference between the contract price and the price he was actually compelled to pay for the gasoline in open market."

In this case it was contended by the plaintiff in the trial court that at the time this contract was breached it was impossible to obtain crude oil for tank car shipment on the market of Sapulpa and in fact throughout the most of the Mid-Continent field, that the available crude oil was being held in storage tanks and the owners were expecting a raise in price and refused to sell for tank car shipments, that it was not possible to obtain oil to fill the plaintiff's demands and requirements and to replace the oil contracted for until the latter part of January, and that by that time the price of oil had materially advanced, and the plaintiff was compelled to pay for the oil plus loading the sum of approximately $2.08 per barrel. The evidence on this point was disputed, the defendant introducing evidence to the effect that there was oil available at the time of the breach of the contract. However, it was not shown that the plaintiff was notified or knew of the available oil. It then appears that on this particular issue there exists a controverted question of fact and on that question it must be assumed that the trial court found the facts in accordance with the evidence of the plaintiff. The nearest available market in point of time and place appears to have been at West Tulsa, where the plaintiff obtained the oil to supply its demands, and the price paid by the plaintiff at that time appears by the evidence in this case to have been in conformity with the market price in the Mid-Continent field. It is also urged in connection with the damages allowed by the court for the breach of the contract that the court erred in permit-

ting the plaintiff to recover for the loss of the use of the cars. This was an item of special damages claimed in the petition of the plaintiff which was specially pleaded and in connection with which proof of the facts alleged was introduced. It is the contention of the defendant that the recovery of the plaintiff should be limited to the difference between the contract price and the value of the property to the plaintiff, and that this measure of recovery is exclusive, and that the value of the property to the plaintiff cannot exceed the amount that was paid by it for the same. This court, however, has adopted the view that this statute contemplates both general and special damages. In the case of Standard Pipe & Supply Co. v. Oil State Pipe Co., 145 Okla. 143, 292 P. 12, this point was under consideration, and the following language appears in the opinion:

"Ordinarily the value of the property to the buyer, as used in this section, means the market value thereof at the place and time contracted for, but it has been held that there are two elements of damages contemplated by the statute—the one general and the other special. Green v. Coleman-Nelson Corp., 115 Okla. 144, 242 P. 196. It was therein said: 'In order to allege special damages, it is necessary to state the particulars of the special damages, being the particular value of the property to the buyer beyond the difference in the contract price and the market price, and further state, by facts or circumstances, that the same was in the contemplation of the contract, and then introduce proof of the facts alleged.'"

The general rule is stated in 55 C. J., at page 1175, paragraph 1158, in the following language:

"In view of the general rule that the buyer is entitled to recover the actual loss he has sustained by reason of the breach of the contract, the buyer is entitled to recover any special damages he has suffered which are the proximate and natural result of the failure to deliver, and which may reasonably be considered as within the contemplation of the parties at the time of the contract, by reason of a knowledge of the special facts and circumstances from which such special damages would arise."

In the case of R. P. Arkley Lumber Co. v. Vincent (Wash.) 209 P. 690, the Supreme Court of Washington had a similar problem to decide with reference to the allowance of special damages. This problem and the solution thereof adopted by the Washington court appears in syllabus 2, which reads:

"Where a seller shipping lumber knew it

might be rejected as not meeting the requirements, and that thereupon railroad demurrage charges would probably arise, such charges may fairly be considered as proximately caused by the breach, and are recoverable as damages."

A similar situation was involved and a similar decision reached in the case of Dickey v. Alaska Pacific Fisheries (Wash.) 182 P. 595. Applying these rules to the case at bar, it is apparent that both of the parties to this contract fully understood that it was the purpose of the plaintiff to forward cars necessary for the shipment of the oil to Sapulpa; that if the oil was not furnished for shipment in those cars, the plaintiff might sustain some loss for idleness of its cars. The proof is introduced in this case to establish that portion of these cars intended to be used for this particular oil were, by reason of the failure of the defendant to deliver the oil, idle until the substituted oil was subsequently obtained at West Tulsa in the latter part of January. Based upon this proof, the court allowed special damages in the general judgment for a portion of the amount claimed for the loss of use of cars. The findings and judgment of the court in this respect is amply sustained by the evidence, assuming for the purpose of determining this question that the evidence was properly admissible.

The remaining contention of the defendant is based upon the alleged improper introduction of evidence concerning four particular phases of the evidence introduced. The defendant first urges that the court erred in permitting evidence to be introduced as to any price of oil other than the market price, referring to the price paid by the plaintiff when it subsequently obtained the necessary oil in the latter part of January from J. C. Fore. We have already held in the previous portion of this decision that the market price of oil at the time of the breach of the contract does not govern under the facts in this case, and it therefore follows that it was not improper for the court to permit the introduction of evidence establishing the price that it was necessary for the plaintiff to pay in order to procure the necessary supply of oil in lieu of the oil which it had expected to obtain under the contract with the defendant.

Defendant next contends that the court improperly admitted evidence as to pipe line and storage charges paid by the plaintiff on the oil which it subsequently obtained. Those pipe line and storage charges on the oil were

a part of the cost of obtaining this particular oil which was obtained in the latter part of January, and being a part of the cost of that oil to the plaintiff, we think it was a proper matter for consideration of the court for a determination of the issues involved in the case. The third contention with respect to the evidence is directed at that portion of the proof which concerns the car rental. Inasmuch as we have already decided that the loss of the use of the cars was an element of special damages in connection with the breach of this contract and that its allowance was proper in view of the pleadings and proof herein, it follows that evidence in support of it was properly admitted.

The fourth complaint concerning the evidence is directed at the testimony of one of the witnesses by the name of Richard Winfield, who was traffic manager for the plaintiff company and resided at Toronto, Canada, and who produced a recapitulation of the books of account of the plaintiff company showing the location and movement of the cars for which the plaintiff claimed damages for loss of use. These books of account were a part of the permanent records of the plaintiff company and were largely in the handwriting of one A. W. Whisken, who resided in Toronto, Canada, and worked in the traffic department under the supervision of the witness Winfield. The original books, or rather loose leaves taken therefrom, were produced and identified by the witness Winfield as a part of the records of the plaintiff company and thereafter a recapitulation taken from these original entries was introduced in evidence. The question is two-fold: First, whether the books were properly identified; second, whether the recapitulation was a proper item of evidence. Section 336, O. S. 1931, reads as follows:

"Entries in books of account may be admitted in evidence when it is made to appear by the oath of the person who made the entries that, such entries are correct, and were made at or near the time of the transaction to which they relate or upon proof of the handwriting of the person who made the entries, in case of his death or absence from the county, or upon proof that the same were made in the usual course of business."

The witness Winfield testified that books of original entry which were produced had been in his custody and that they were made under his direction and that he was familiar with the making of the records at the time they were made and that he had himself re-

moved the loose leaves from the books for the purpose of bringing them to the trial; that they were in the handwriting of A. W. Whisken, who worked under him, and that Mr. A. W. Whisken resided in Toronto, Canada, and that the entries were made in the usual course of business. It appears from an examination of the record that the provision and requirements of section 336, quoted, supra, were fully complied with and that the record was properly admissible.

The recapitulation taken from these records was admissible under the decision of this court in the case of Hooven et al. v. First National Bank, 134 Okla. 217, 273 P. 257, in which this court announced the rule to be:

"Where a fact is ascertainable only by the inspection of a large number of documents made up of numerous detailed statements. a competent witness, who has perused all the documents, may state summarily the net result thereof."

It therefore appears that the trial court committed no error in the admission of evidence, and from a full and complete consideration of the entire case, we are convinced that the decision of the trial court should be in all respects affirmed.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, ANDREWS, OSBORN, BAYLESS, and WELCH, JJ., concur. McNEILL, J., disqualified.