Don TIDMORE d/b/a Transportation Consultants, Inc., Appellee,

v.

OFFICE OF the GOVERNOR, DEPARTMENT OF INDUSTRIAL DEVELOPMENT, Appellant.

No. 54536.

Court of Appeals of Oklahoma, Division No. 2.

Sept. 15, 1981.

As Corrected Oct. 2, 1981.

Released for Publication by Order of Court of Appeals Nov. 5, 1981.

Michael R. Vanderburg, Ellis, Vanderburg & Insabella, Tulsa, for appellee.

Jan Eric Cartwright, Atty. Gen., Manville T. Buford, Asst. Atty. Gen., Oklahoma City, for appellant.

BRIGHTMIRE, Judge.

I

Early in former Governor David Hall's administration, his office, acting through the Department of Industrial Development, ("D.I.D.") entered into three "professional services" or rate studies contracts with Transportation Consultants, Inc. ("T.C.I.").

The first was an oral one made in September, 1971, by the director of D.I.D., Arthur D. Lindberg, after conferring with A. W. "Sunny" Jenkins, then Administrative Assistant to the Governor, as to the feasibility of rate studies. A written extension of it, covering the period from July 1, 1972 to June 30, 1973, was later executed by D.I. D.'s director. It called for T.C.I. to provide transportation consultation services as re-

quested by Lindberg or his assistant. In turn T.C.I. was to be paid a "retainer" of $1,000 a month. The contract was subject to cancellation by either party upon 30 days written notice.[1] Lindberg signed the agreement on behalf of D.I.D. and we will have to assume Don Tidmore signed the original as president of T.C.I. because the copy placed in evidence is not executed by T.C.I.

A second agreement was negotiated in May, 1972, resulting in the preparation of a $19,000 consultation agreement.[2] Again the copy in the record was signed by Lindberg but not by any agent of T.C.I.

1. Plaintiff's Exhibit 1 reads:

Term of Contract: July 1, 1972—June 30, 1973 Transportation Consultants, Inc., will provide transportation consultant services upon assignment by the Director and/or Assistant Director of the Department of Industrial Development. Project assignments will include request of new, expanding, or existing industry that the Director and/or Assistant Director determines to be departmental overload and/or beyond the capability of Department staff.

Compensation: Retainer Basis of $1,000.00 per month.

Timely payments will be subject to satisfactory project reports submitted to the Department. These project reports will become property of the Department of Industrial Development.

This contract can be cancelled by a thirty (30) day written notice by either party.

                s/ Arthur D. Lindberg
Transportation Consultants, Inc.   Dept. of Industrial Development

2. Defendant's Exhibit 20 reads:

May 18, 1972
Mr. Don Tidmore
President
Transportation Consultants, Inc.
55 North Harvard
Tulsa, Oklahoma 74115
Dear Mr. Tidmore:
Herewith are two original copies of the Agreement we negotiated yesterday in Tulsa.

As I pointed out to you yesterday there are many items in the Agreement that we, as a state agency must insist upon and I don't believe you will find any of the provisions objectionable. If you have any questions, please give me a call and I will advise you of [sic] the modifications with which we can live.

Please execute both copies of the enclosed Agreement and forward the original to me for our permanent records.

        Sincerely,
        s/ Art
        Arthur D. Lindberg
        Director

May 18, 1972
Mr. Don Tidmore
President
Transportation Consultants, Inc.
55 North Harvard
Tulsa, Oklahoma 74115
Dear Mr. Tidmore:
The Industrial, Business and Economic Division of the Oklahoma Industrial Development and Park Department, hereinafter referred to as "Department", wishes to contract with Transportation Consultants, Inc., an Oklahoma corporation, hereinafter referred to as "Company" on the following conditions, to wit:

1. On or before November 1, 1972 the Company is to deliver to the Department in a form acceptable to the Director of the Department with all amendments and modifications thereto required by the Director of the Department to be performed by the Company at the Director's of the Department discretion the following items of work:

a. A Transportation Study known as "500 Mile Trade Territory Study". This study is to show the economic feasibility of serving points within a 500 mile radius of the State of Oklahoma. This study is to give, in depth, the time in transit and transportation cost by different modes of transportation on the 17 commodities recently studied by the Fantus Company of New York. These Fantus study reports are known as "The 17 Product Studies." This study is to deal with LTL, volume and AQ shipments by truck and on the basis of LTL, volume and AQ by rail.

b. A Transportation Study known as "States surrounding the State of Oklahoma Study." In this study the Company is to compare the surrounding states of Texas, New Mexico, Colorado, Kansas, Missouri, Arkansas and Louisiana with the State of Oklahoma. As in the case of the above referred study, this is to be an in depth comparative analysis of our competition with the surrounding states named herein.

c. A Transportation Study known as "Water Transportation Study." In this report the Company is to place special emphasis on water transportation. Low cost water transportation could make Oklahoma a vast distribution center; therefore the Company will be obliged to provide a comparison of Water-Rail and Water-Truck studies to show exactly how Oklahoma can compete with other modes of transportation and also other ports such as Omaha, Kansas City, Houston and the West Coast.

2. As compensation for the Company's service on the three studies outlined herein the Department will pay a flat rate of $19,000.00. This payment will be made upon receipt by, and acceptance by the Director of the Department. It is understood and agreed that the Department will pay for Study a. $5,000.00, for study b. $6,000.00, and for study c. $8,000.00. Disbursement will be made by the Department

A third contract, this time for $23,000, dated February 12, 1973, was executed by Lindberg as agent for the governor's office and Tidmore as president of T.C.I.[3]

to the Company on the individual studies as they are received and accepted separately, or on all three studies if they are received at one time.

3. It is further understood and agreed by and between the parties hereto that the Company, from time to time, as requested by the Director of the Department, will render the studies mentioned herein current and that the Company will provide such updated materials as are necessary to maintain a reasonably current status.

4. If the Department should elect to continue the services of the Company beyond November 1, 1972, the Company's compensation shall be negotiated between the parties hereto based on future studies that will be required by the Department.

5. The arrangement with the Company is in no way to be an exclusive arrangement. Nothing during the term of this Agreement shall prevent the Company from furnishing services to others, provided it does not include other municipal, county and state divisions requiring the services herein requested by the Department.

6. During the consulting period the Company shall be an independent contractor. The Company shall have no authority to contract for, or to incur any obligations for the Department, or to make any representation on behalf of, or binding upon the Department.

7. Neither this Agreement nor the Company's relationship with the Department shall in any way restrict the Company from making any arrangements for direct or indirect reasonable compensation with industrial, commercial, and banking concerns for any services the Company may perform over and above the initial introductions referred to in this Agreement.

8. In accordance with this Agreement and the month by month retainer between the Company and the Department, if inequities are found to exist in any of the studies contracted for herein, the Company will agree to initiate rate proposals with regulatory bodies for correction. This will allow the Department to maintain a favorable rate structure and necessary services for the continued growth of the State of Oklahoma.

9. It is further mutually understood and agreed that much of the content of the studies referred to herein will be proprietary and that these studies are to be for the exclusive use of the Department and no portion thereof is to be disseminated without the prior written approval having first been obtained from the Director of the Department.

If the foregoing is in accordance with the understanding of the Company, will the President please sign and return the enclosed copies of this letter whereupon this Agreement shall be in full force and effect.

INDUSTRIAL, BUSINESS AND ECONOMIC DIVISION OF THE OKLAHOMA INDUSTRIAL DEVELOPMENT AND PARK DEPARTMENT
By s/ Arthur D. Lindberg
Agent

Subscribed and sworn to this 18th day of May, 1972.

s/ Kay Hammon
Notary Public

My Commission Expires: 2–20–74
TRANSPORTATION CONSULTANTS, INC.
By ————————
President

3. Plaintiff's Exhibit 17 reads:

February 12, 1973
Mr. Don Tidmore
President
Transportation Consultants, Inc.
55 North Harvard
Tulsa, Oklahoma 74115
Dear Mr. Tidmore:

The Office of the Governor, Department of Industrial Development, hereinafter referred to as "Department," wishes to contract with Transportation Consultants, Inc., an Oklahoma corporation, hereinafter referred to as "Company" on the following conditions, to wit:

1. On or before April 1, 1973, the Company is to deliver to the Department in a form acceptable to the Director of the Department with all amendments and modifications thereto required by the Director of the Department to be performed by the Company at the Director's of the Department discretion the following items of work:

a. Transportation Studies known as "Warehousing and Distribution Studies." These studies would give complete information on the various regulations and the cost of warehousing and distribution in the State of Oklahoma and rate comparisons with our chief competitors in other states.

b. Transportation Studies known as "Oklahoma Transit Privilege Studies." These studies will give detailed information on the highly technical subject of stopping in transit to perform various services such as warehousing, fabricating, reworking and sorting. They will also contain comparisons which will show the vast savings that can be derived from using transit privilege.

2. As compensation for the Company's service on the studies outlined herein, the Department will pay a flat rate of $23,000.00. This payment will be made upon receipt by, and acceptance by the Director of the Department.

On February 3, 1972, the state issued a check for $1,000 to "D. Tidmore." Additional checks for the same amount to the same payee were made on February 22, March 23, April 24, May 22, June 21, July 25, September 5, October 3 and October 26 as payments on the first contract. On November 17, 1972, a check for $19,000 was issued to "Transportation Consultants, Inc.," as payment on the second agreement. The next retainer check for $1,000 dated December 28, 1972, was made payable to "Transportation Consultants, Inc." Another was issued for the same amount to the same payee February 5, 1973, and a third dated March 2, 1973. All these checks were cashed by Tidmore, bringing the total amount he received to $32,000.

In the meantime Resolution 27 was working its way through the state senate. It called for creation of a special committee to "conduct a full scale investigation of the policies, operation, expenditures and all other matters relating to the Department of Industrial Development with particular emphasis on the relationship between the Department and Transportation Consultants, Inc."

This resolution was adopted March 27, 1973, and may have had some bearing on cessation of the $1,000 retainer and the recission of the third contract.[4]

3. It is further understood and agreed by and between the parties hereto that the Company, from time to time, as requested by the Director of the Department, will render the studies mentioned herein current and that the Company will provide such updated materials as are necessary to maintain a reasonable current status.

4. If the Department should elect to continue the services of the Company beyond April 1, 1973, the Company's compensation shall be negotiated between the parties hereto based on future studies that will be required by the Department.

5. The arrangement with the Company is in no way to be an exclusive arrangement. Nothing during the term of this Agreement shall prevent the Company from furnishing services to others, provided it does not include other municipal, county and state divisions requiring the services herein requested by the Department.

6. During the consulting period the Company shall be an independent contractor. The Company shall have no authority to contract for, or to incur any obligations for the Department, or to make any representation on behalf of, or binding upon the Department.

7. Neither this Agreement nor the Company's relationship with the Department shall in any way restrict the Company from making any arrangements for direct or indirect reasonable compensation with industrial, commercial, and banking concerns for any services the Company may perform over and above the initial introductions referred to in this Agreement.

8. In accordance with this Agreement and the month by month retainer between the Company and the Department, if inequities are found to exist in any of the studies contracted for herein, the Company will agree to initiate rate proposals with regulatory bodies for correction. This will allow the Department to maintain a favorable rate structure and necessary services for the continued growth of the State of Oklahoma.

9. It is further mutually understood and agreed that much of the content of the studies referred to herein will be proprietary and that these studies are to be for the exclusive use of the Department and no portion thereof is to be disseminated without the prior written approval having first been obtained from the Director of the Department.

If the foregoing is in accordance with the understanding of the Company, will the President please sign and return the enclosed copies of this letter whereupon this Agreement shall be in full force and effect.

OFFICE OF THE GOVERNOR,
DEPARTMENT OF INDUSTRIAL DEVELOPMENT

By s/ Arthur D. Lindberg
Agent

Subscribed and sworn to this 22nd day of February, 1973.

s/ Kay Hammons
Notary Public

My Commission expires: February 20, 1974
The above Agreement is accepted as of this 26 day of ——, 1973.

TRANSPORTATION CONSULTANTS, INC.
By s/ Don Tidmore
President

Subscribed and sworn to this 26th day of February, 1973.

s/ Janie L. Shelton
Notary Public

My Commission Expires:
My Commission Expires June 4, 1974

4. Plaintiff's Exhibit 18 reads:
RETURN RECEIPT REQUESTED
REGISTERED
Mr. Don Tidmore
Transportation Consultants, Inc.
55 North Harvard

A special senate committee was appointed and it launched an extensive investigation into the matter. Among other things the committee found that no such corporate entity called Transportation Consultants, Inc., existed; that Lindberg did not have legal authority to enter into the first two contracts; and, that the third contract had been rescinded by the Industrial Development Commission after the adoption of Senate Resolution 27.

## II

At trial, Tidmore produced what was, he said, a letter to Never Fail, Jr., then chairman of the Industrial Development Department. It was an unsigned original, typed on letter-size typing paper bearing the date of June 27, 1973. There is no evidence that this self-serving letter was ever mailed or given to Fail and should never have been admitted into evidence. It probably would not have been had the State objected to its admission. In it Tidmore complained that he had not been given the required 30 days cancellation notice as required by the retainer agreement. He also said that he had completed the study called for in the February 12, 1973 contract. He did not tender the "study" in the purported letter nor did he offer it in evidence.[5] He did, however, testify that he orally tendered it to Lindberg on the phone.

Other evidence that should be mentioned includes the fact that Tidmore worked full-time for the Tulsa Chamber of Commerce and carried out rate studies for it. Lindberg had worked with him at the Chamber for several years during which time they developed a close friendship.

The most significant conflict in the evidence is with respect to whose idea it was to use the name of a nonexistent corporation as a party to the contracts. Tidmore said it was Lindberg's idea. Lindberg, on the other hand, said Tidmore instructed him to use the name.

The State offered no defensive evidence save a copy of the state senate's investigative report, which was not admitted as evidence but became the subject of an offer of proof, and, a stipulation that a search revealed no evidence that T.C.I. existed or had paid any taxes. Its defense was simply a general denial of Tidmore's allegations. It relied primarily on what it could glean from cross-examination to defeat this action and support its three main contentions, viz., (1) plaintiff failed to prove the requisite elements of a binding and enforceable contract; (2) plaintiff failed to prove that the third contract was approved by the required state authority; and, (3) the plaintiff's proof of damages raised fact issues for jury resolution.

The trial judge rejected the State's contentions and directed the jury to return a verdict for plaintiff for all he asked, namely, $23,000 on the third contract, $2,000 due under the first retainer contract at the time of the termination and $1,000 due for the 30-day-notice period.

The State appeals, advancing two primary points of error: (1) the court should have directed a verdict for it; or if not,

Tulsa, Oklahoma 74115
Dear Mr. Tidmore:
This has reference to the contract dated February 12, 1973, between Transportation Consultants, Inc. and the State of Oklahoma, Department of Industrial Development covering two transportation studies listed in said contract under Item 1., a. and b.
My Commission, with the exception of our Chairman who is out of the state, have unanimously directed me to advise you that this contract is hereby broken on the basis of the misrepresentation of your firm and the fact that an investigation has revealed there is no such corporation in business.

Likewise, please be advised that the Agreement of July 1, 1972 to June 30, 1973 covering your consultant services is also hereby terminated for the same reason cited above.
We regret this action but I believe that you can see our position as a state agency and that we cannot be a party to any agreement improperly drawn.
Sincerely,
s/ Arthur D. Lindberg
Arthur D. Lindberg
Director

5. This is nearly as remarkable as the fact that there is no indication of an attempt by the state to obtain it with a view toward offering it in evidence.

then, (2) the case should have been submitted to the jury.

### III

The State's first proposition is fastened mainly onto two legal conclusions. First, it says, the ultimate power to employ consultants rests with the Industrial Development Commission and not its director. The second is that a contract cannot exist between an entity and a nonentity.

Both conclusions are founded on the statutorily prescribed essentials of a contract.[6]

With regard to the first point, the State directs attention to the 1972 act creating the Oklahoma Industrial Development Commission.[7] Section 2002 C authorizes the governor to appoint a director and to employ "other office and technical staff and *consultants* on such terms and conditions as he shall consider necessary . . . , *fixing their duties and compensations upon the approval of the Commission* . . . ." [8] The argument is that the retainer contract was an oral one between Lindberg and his old friend Tidmore, which was apparently superseded by a written agreement between Lindberg and a nonentity, and neither pact ever ripened into a valid contract because neither was approved by the Commission as required by law.

■ The point could have serious potential were it not for the fact that prior to trial plaintiff submitted to the State a request to admit a series of fact allegations. On November 19, 1977, the attorney general filed a response admitting that the first and third written agreements were approved by the Commission. Apparently no effort was ever made to withdraw the admission. It was offered and admitted into evidence at trial and it is now binding on the State. The question left open by the admission is whether the Commission, under the evidence, can be said to have approved the fixing of duties and compensation of Tidmore himself. Since this question overlaps the State's second point we will discuss them together.

The other part of the State's bifurcated argument may therefore be reframed thus: Did the State employ Don Tidmore as a consultant and fix his duties and compensation; and, if so, did the Commission approve his duties and compensation?

The trial court concluded that though it was admitted that no such entity called Transportation Consultants, Inc., existed, still it was the services and expertise of Tidmore that the State wanted and that its officials thought they were contracting for. He found that Tidmore's misrepresentation that T.C.I. existed was an immaterial one which caused no detriment to the State. For these reasons he decided the name of the contracting party should be ignored and the agreements should be treated as if they had been made with Tidmore as an individual. The judge commented that had there been a refusal to perform the contracts, the State could have sued Tidmore for damages, because all it amounted to was that he was doing business as, hence contracted in the name of, Transportation Consultants, Inc.

The trial judge has a point, of course, but what troubles us is the fact that nowhere in the record is it shown that Tidmore ever did business as T.C.I. until he filed this lawsuit. Aside from the mystery of why the cloak of a fictitious corporate name was deemed desirable by either party there is a serious conflict in the evidence as to whether, early on, any state official knew there was no corporation involved. Tidmore, as we mentioned earlier, said the corporate facade was Lindberg's idea and that he did not hold himself out as doing business as a corporation or under any other fictitious name.

---

6. 15 O.S.1971 § 2. It reads in relevant part:

"It is essential to the existence of a contract that there should be:
  1. Parties capable of contracting.
  2. Their consent. . . ."

See also 15 O.S.1971 § 28. It says:

"It is essential to the validity of the contract, not only that the parties should exist, but that it should be possible to identify them."

7. 74 O.S.1972 Supp. § 2001 *et seq.*

8. emphasis added.

Lindberg, on the other hand, said Tidmore told him how to designate the contracting party and he, Lindberg, thought such a corporation actually existed.

▬▬ So the question is, does it make any difference who is telling the truth? We think it does. If the fact is that the State thought it was contracting with a corporation based on the representations of Tidmore then it seems fairly obvious that Tidmore did not want, for some reason, to personally contract with the State. This was his perogative. It is not a question of whether the State suffered any detriment from the subterfuge. The issue is with whom or what did the State contract. If neither party intended that Don Tidmore be a party to the contracts then the State certainly could not have enforced the contracts against Tidmore had it wanted to. None of the contracts would have been binding on him. And if Tidmore was not bound, the contracts were unenforceable for lack of mutuality—a failure of consideration—at least as to unexecuted portions.[9] The State may have had a tort action of some sort against Tidmore for misrepresentation or the like but had he been sued on any of the contracts he would have had a perfect right to insist that the State agreed not to hold him personally responsible for performance of them. For the very same reason Tidmore would have no right of action on the contracts.

Of course, if the fact is as Tidmore says— that the State not only knew but insisted on using a fictitious name to contract with Tidmore—then it might be estopped to complain about Tidmore's enforcement of the agreements, unless it is shown that Tidmore condoned and conspired to carry out the subterfuge.

9. *Consolidated Pipe Line Co. v. British Amer. Oil Co., Ltd.*, 163 Okl. 171, 21 P.2d 762 (1933).

If our approach seems a bit tedious it should be remembered the parties, not we, created the unusual situation. What Tidmore is in effect asking the court to do now is what he should have insisted the State do then—rewrite the contracts.

Nor are we reluctant to be technical in applying the law under the circumstances. Tidmore, who waited four years before filing this action, is trying to recover damages based merely on his unsupported statement that he fulfilled or was ready to perform the contractual obligations. This, of course, is a technical compliance with the proof requirements so far as a prima facie case is concerned. Rebutting it four years after the occurrence when some knowledgeable personnel may be dead or otherwise unavailable, handicaps the State.

We hold that the case should have been submitted to the jury to determine whether the State understood it was contracting with, and intended to contract with, Don Tidmore as an individual or whether it understood it was contracting with a corporation. If the jury finds the latter to be the fact then a verdict should be returned for the State. If the jury finds the former to be the fact then they should determine the amount of damages resulting from the breach based on the evidence regarding Tidmore's performance.

The judgment appealed is reversed and the cause is remanded for a new trial.

BACON, P. J., and BOYDSTON, J., concur.