GRAFEMAN DAIRY COMPANY, Appellant, v. ST.
LOUIS DAIRY COMPANY, Respondent.

**St. Louis Court of Appeals, November 11, 1902.**

1. **Evidence: PRACTICE, TRIAL: PRACTICE, APPELLATE.**
Where there is evidence both ways on an issue of fact, an appellate
court will not, in a case at law, review the evidence to ascertain
for itself whether or not the trier or triers of the facts arrived at a
correct conclusion.

2. **Contract: RESCISSION OF CONTRACT: NOTICE.** When a
party to a contract refuses to perform one of the essential terms
after notice, the other party is justified in rescinding it, if he is in
a position to demand specific performance.

Appeal from St. Louis City Circuit Court.—*Hon.
William Zachritz,* Judge.

AFFIRMED.

*E. T. & C. B. Allen* for appellant.

(1) Defendant renounced the contract, and
plaintiff's right of action for profits lost, accrued at
once. Berthold v. Co., 165 Mo. 280; Roehm v. Horst,
178 U. S. 1; Chapman v. Railroad, 146 Mo. 494; Ga-
briel v. Co., 57 Mo. App. 526. (2) A vendee's right
to rescind the whole contract upon the failure of the
vendor to properly deliver one installment, is waived
by having accepted and paid for previous installments
of the same kind. Scott v. Co., 89 Pa. St. 231; Morgan
v. McKee, 77 Pa. St. 228; Cohen v. Platt, 69 N. Y.
348. (3) Rescission or renunciation of a contract
is an affirmative defense, and the burden of proof is on
defendant. Riggins v. Railroad, 73 Mo. 598; Brown
v. Weldon, 27 Mo. App. 260; Reynolds v. Reynolds, 45
Mo. App. 628. (4) The default by one party in mak-
ing deliveries or payment will not release the other

party from his duty to make the other deliveries or payments stipulated in the contract "unless the conduct of the party in default be such as to evince an intention to abandon the contract or a design to no longer be bound by its terms." West v. Bechtel, 51 L. R. A. 791; Worthington v. Given, 43 L. R. A. 312; Sawyer v. Railroad, 22 Wis. 402; Meyer v. Wheeler, 65 Iowa 396.

*A. & J. F. Lee* and *Geo. R. Lockwood* for respondent.

(1) Defendant had a right to reject milk that did not come up to the standard of the alleged contract. Calhoun v. Paule, 26 Mo. App. 274; Enterprise Soap Works v. Sayers, 55 Mo. App. 15. (2) The denials of defendant's answer and its special plea of a rescission of the contract were not inconsistent. Brinkman v. Hunter, 73 Mo. 172; Lowrey v. Danforth, 69 S. W. 39. (3) And by keeping and paying for milk not up to the contract, defendant did not estop itself from pleading such breach as sufficient ground for its refusal to take more milk from plaintiff. Nor do such facts estop defendant from rescinding the contract. Bispham's Equity (2 Ed.), sec. 280; Crane Co. v. Columbus Const. Co., 73 Fed. Rep. 984. (4) The court properly refused plaintiff's instruction which authorized a recovery for 12,928 gallons.

BLAND, P. J.—A short time prior to October 1, 1900, plaintiff company and defendant company, both corporations, entered into a verbal agreement whereby plaintiff agreed to make daily deliveries of condensed milk to the defendant, beginning on October 1, 1900, and to continue until October 1, 1901. This verbal agreement was acted on for some time by both parties when, at the request of J. P. Cabanne, president and general manager of the defendant, the agreement was reduced to writing by an officer of the plaintiff; after which it was executed by the plaintiff

and in this form sent to Cabanne for the signature of his company. Cabanne received the written contract and retained it in his possession without objection but neglected to have it executed by his company. The contract in its written form is as follows:

"This agreement made this first day of October, 1900, between the St. Louis Dairy Company, a corporation of the State of Missouri, city of St. Louis, party of the first part; and the Grafeman Dairy Company, a corporation of the same state and city, party of the second part, witnesseth:

"First. That the party of the first part agrees to purchase all the condensed milk it uses from the party of the second part at the following prices: October, November, December, 1900, and January, February, March, 1901, fifty-two and one-half cents per gallon; April, May, June, July, August, September, 1901, forty-seven and one-half cents per gallon. The condensed milk to average ten and one-half per cent butter-fat, and to be of good flavor, uniform texture and proper solubility. The party of the first part agrees to place its orders for condensed milk no later than twenty-six hours before the required time of shipment, and to purchase no less than two cans nor more than ten cans on any one day.

"Second. It is mutually agreed that the party of the second part shall furnish the party of the first part, at the latter's option or request, either every day or any day during the life of this agreement, as many as fifteen cans of eight gallons each of whole, merchantable, fluid milk. The party of the first part agrees to furnish its own cans, and to give the party of the second part twenty-four hours notice before the time of shipment, of any such demand for milk. The party of the first part to pay for fluid milk delivered under this agreement the same price it pays its shippers. The party of the second part agrees in case of failure to deliver such milk as may be ordered on any day or days, to pay the party of the

first part as liquidated damages therefor, the cost price here mentioned for every gallon of. milk it fails to deliver under this agreement. The party of the first part to pay for all goods purchased under this agreement monthly, on or before the tenth day of the next month.

"The term of this agreement shall be for one year from the date first mentioned.

"In witness thereof the proper officers of the said parties have hereunto set their hands and affixed the seals of their respective companies this first day of October, 1900.

[Seal of Grafeman Dairy Co.]

"GRAFEMAN DAIRY COMPANY.

(Signed)    "W. GRAFEMAN, Prest."

The action is for a breach of the contract on the part of defendant in this, that defendant refused, after April 23, 1901, to receive any milk from the plaintiff, and for the recovery of $313.50, the contract price for six hundred and sixty gallons of condensed milk delivered in the month of April, 1901.

The answer admitted that defendant owed plaintiff $313.50 for six hundred and sixty gallons of milk delivered in April, 1901, and made a tender of that amount with legal interest thereon and of the costs of the suit accrued at date of the tender; denied that the milk was furnished on the contract as alleged by plaintiff and alleged that there was no agreement that plaintiff should furnish defendant milk except as ordered from time to time by defendant and that it was particularly understood that whenever defendant should order condensed milk it should average ten and one-half per cent butter-fat, be of good flavor, uniform texture and proper solubility; that the condensed milk furnished by plaintiff in April was to the knowledge of plaintiff not of the percentage of butter-fat agreed upon, not of good flavor, uniform in texture, nor of the proper solubility, but that defendant elected to receive and retain all condensed milk delivered to it by plaintiff under the agreement in the

month of April, 1901. But on account of the inferiority of the milk, defendant, about April 22, notified plaintiff not to deliver it any more condensed milk under the agreement and that it would not receive any more of its milk.

The reply admitted that the defendant deposited with the clerk of the circuit court for the use of plaintiff $313.50 and $11.25, interest, and $61.25 in payment of the costs which had accrued, and admitted that on or about April 22, 1901, defendant had notified it not to furnish any more condensed milk.

A jury was waived and the issues were submitted to the court, who, after hearing the evidence and passing on declarations of law asked by plaintiff, found the issues for plaintiff and assessed its damages at $334.75, but adjudged all the costs against plaintiff and awarded execution therefor.

A timely motion for new trial was filed by plaintiff which the court denied and plaintiff appealed.

The evidence shows that the written contract was prepared by plaintiff's officer at the request of J. P. Cabanne, defendant's president and general manager, that it was duly signed by plaintiff, forwarded to Cabanne, who received and retained it in his possession without objection and acted upon it and exacted of plaintiff a compliance with its terms until April 22, 1901, when Cabanne notified plaintiff that defendant would not receive any more condensed milk under the contract. In this state of the evidence the defendant is estopped by its conduct to say that the writing is not its contract and it is as much bound by its terms as if it had formally and solemnly executed it.

The evidence tends to show that, had plaintiff been permitted to deliver to defendant the condensed milk agreed to be furnished from April 22 to October 1, 1901, plaintiff's profits would have been from $800 to $1,292.80.

About three-fifths of the condensed milk furnished defendant by plaintiff was used by defendant for the manufacture of ice cream. Plaintiff was fully in-

formed of the purpose for which defendant wished to use the milk when the contract was first entered into.

A. B. Clark, who superintended the manufacture of ice cream at defendant's dairy, testified that about the first of April, 1901, he learned of a number of complaints from its customers of the ice cream manufactured by defendant and that the defendant lost trade on account thereof; that at least two-thirds of the milk furnished during that month was bad and ice cream made of it showed minute lumps, apparent to the taste; that at first he thought the lumps came from sand in the sugar; that he examined the sugar and found it free from sand. He then made a more thorough examination and found that the lumps came from the condensed milk and that he could plainly taste the lumps in the milk; that he tried to use it for a while but later refused to use it for the manufacture of ice cream and reported the fact to Cabanne.

Cabanne testified that about April 1, he telephoned to Grafeman, president and superintendent of plaintiff company, that the milk was deficient in butter-fat, insoluble and had a bad taste and asked him to come over to the dairy, but Grafeman failed to come. On being called on later Grafeman came over to the dairy and went with Cabanne to the milk room.

Cabanne also testified that while he and Grafeman were in the milk room he called Grafeman's attention to some cans of milk furnished by the plaintiff then in the room, to the fact that it smelled bad, was of a bad flavor and grainy. Grafeman tasted the milk and said it was all right; that he (Cabanne) took a pencil and dipped it into one of the cans and showed it to Grafeman that he might see the milk was grainy as the grains showed on the pencil, and it was light enough to see them; that he took a sample of the milk and went into the laboratory with Grafeman and showed him that it was insoluble, that notwithstanding this, Grafeman said the milk was all right and then alluded to the fact that there was a contract. To this Cabanne replied: "Contract or no contract, if you

·can't deliver the goods as agreed we won't take them,'' and asked Grafeman to take the milk back and give him other milk. Grafeman refused to do this and he (Cabanne) then told Grafeman that he considered the ·contract broken and not to send him any more milk.

The milk on hand April 22 was sent back to the ·Grafeman dairy and set on the sidewalk but it was .included in a bill rendered for the milk furnished in April, of which Cabanne said he was ignorant until after he had tendered payment of the April bill.

John Geiger, at the time chemist for defendant ·company, testified that the cans had a bad smell which he thought came from their having stood in salt water; that he had the milk emptied into Cabanne's cans and notified Grafeman of the bad smell and that his cans were dirty and Grafeman promised to remedy the trouble but did not do so. A week later he saw Grafeman when he again promised to remedy the evil.

Grafeman testified that all the milk furnished defendant was all right and filled all the requirements of the contract; that when he was in defendant's milk room with Cabanne it was too dark to see grains on a pencil; that he saw the name of his company on some ·of the cans and tasted the milk and found it all right. He denied that Cabanne made a test of the solubility ·of the milk in his presence and said that he tried to reason with Cabanne and told him the goods were all right, if not, to come over to his dairy and he would ·exchange them at any time; that Cabanne got angry, said the goods were not good and that he would not ·use them.

There was evidence that defendant procured milk ·after April 22 from another concern at a cheaper rate than it had been paying plaintiff, but the goods proved bad and defendant had to order its condensed milk from a firm in Chicago, Illinois, at about the cost of ·milk from plaintiff.

The plaintiff asked and the court refused the following instructions:

''The court declares the law to be that under the

pleadings and evidence in this case there should be a verdict for plaintiff in the sum of fifteen hundred dollars.''

''The court declares the law to be that there is no evidence in this case that plaintiff on or about April 22, 1901, or at any time prior thereto, intended to abandon the contract in evidence, or had formed a design to no longer be bound by its terms, or was unable or unwilling to perform same on its part.''

Leaving out of view the evidence tending to show that defendant was excusable in refusing to take milk from plaintiff after April 22, 1901, the evidence, as to the amount of damages plaintiff sustained by reason of the refusal of defendant to take the condensed milk for the whole of the contract period, was conflicting and therefore the instruction that plaintiff was entitled to damages in the sum of $1,500 was rightfully refused. The second instruction quoted ignores the whole of the evidence offered by plaintiff and was therefore properly refused.

At the instance of plaintiff the court gave eight instructions covering five pages of printed matter and two on behalf of defendant, correctly declaring the law of the case, so that plaintiff got all the law asked and a good deal more of it twice repeated, but the court beat the plaintiff on the facts. This, is the principal complaint.

The cause was tried on the theory that there was a written contract, which defendant had broken. The excuse set up by defendant for its breach was that the milk furnished from day to day in April was of a quality inferior to that which plaintiff agreed to furnish and that plaintiff, after being repeatedly notified of the fact, failed and refused to furnish the quality of milk contracted for. There was evidence both ways on this issue. Where this is the case an appellate court will not, in a case at law, review the evidence to ascertain for itself whether or not the trier or triers of the facts arrived at a correct verdict. Conceding then, as the evidence tends to prove, that plaintiff was furnish-

ing defendant with inferior milk, unfit for the purpose for which it was to be used and that plaintiff was repeatedly notified of this fact and failed and refused, after such notice, to furnish contract milk, was defendant bound to continue to accept bad milk to the end of the contract period and then sue plaintiff for its damages, or might it refuse to receive bad milk and seek its supplies elsewhere? It seems to us that the question answers itself. That defendant was not bound under its contract calling for daily deliveries of goods, to continue to receive inferior goods throughout the contract period, especially after it had complained to the other party and that party had insisted that the goods were of the grade and quality called for by the contract. In such circumstances it is the party who furnishes the inferior goods who first breaches the contract and when he manifests a determination to continue these breaches from day to day the other party ought to be at liberty to rescind the contract, for the law is that when one party to a contract refuses to perform one of the essential terms after notice, the other party is justified in rescinding it, if he is in a position to demand specific performance. McGrath v. Gegner, 77 Md. 331; Hale v. Cravener, 128 Ill. 408; Higby v. Whittaker, 8 Ohio 198; Luey v. Bundy, 32 Am. Dec. 359.

The judgment is against plaintiff for all the costs. This was perhaps an oversight on the part of the clerk in entering up the judgment; nevertheless it is wrong. Defendant had, with its tender, paid to the clerk $61.25 to cover the costs accrued to that date. This sum is still in the hands of the clerk and the defendant consents here that it may be applied to the purpose for which it was tendered. The judgment for costs will, therefore, be modified and judgment entered here against plaintiff for all costs, after deducting therefrom the sum of $61.25. With this modification the judgment is affirmed. *Barclay* and *Goode, JJ.,* concur.