SUNRAY DX. OIL COMPANY, a Corporation, Plaintiff in Error,

v.

GREAT LAKES CARBON CORPORATION, a Corporation, Defendant in Error.

No. 42511.

Supreme Court of Oklahoma.

July 21, 1970.

Rehearing Denied and Motion to Modify Judgment Denied in Supplemental Opinion Oct. 27, 1970.

J. P. Greve, John A. Ladner, Jr., Tulsa, for plaintiff in error.

C. H. Rosenstein, Rosenstein, Mesirow, Livingston, Fist & Ringold, Tulsa, for defendant in error.

LAVENDER, Justice.

The appeals herein, by both parties in the trial court, arise out of an action in which Sunray DX Oil Company, a corporation, as plaintiff, sued Great Lakes Carbon Corporation, a corporation, as defendant, for amounts allegedly due under a written contract dated March 1, 1957, for petroleum coke delivered to the defendant during the months of August, September, and October of 1962, and for damages for alleged breach of such contract by the defendant by wrongfully, and without cause, terminating such contract as of November 1, 1962.

Trial to the court, without a jury, resulted in a judgment for the plaintiff, on its action on the contract, in the principal sum of $325,555.22 plus interest accrued on the separate items making up such sum, and interest thereon from the date of the judgment, and a judgment for the defendant on the plaintiff's action for damages for breach of contract. The appeal of each of the parties (after the overruling of their respective motions for a new trial) involves the judgment in favor of the opposing party.

Substantially all of the facts are covered by a stipulation of the parties and there is no substantial conflict in the testimony of the witnesses concerning matters not covered by the stipulation.

The written contract involved herein, denominated a "Coke Purchase Agreement," was entered into between Ucan Products Co., a corporation (a remote predecessor-in-interest of the plaintiff), as "Seller," and the defendant in the action,

as "Buyer." Under the provisions of the contract, the seller agreed to sell and deliver, and the buyer agreed to buy, take delivery of, and pay for, all of the petroleum coke (therein, and hereinafter, called "coke") produced by the seller at its plant at Sunray, Oklahoma (which is located near Duncan, Oklahoma, and is sometimes referred to as the Duncan plant), for a period of ten years from and after the first day of March, 1957.

The contract also provided a formula for determining the price per ton to be paid for the coke, based upon the prevailing price of 36-degree gravity Southern Oklahoma sweet crude oil; that the buyer would take delivery of the coke as produced by the seller, with the seller to deliver the coke "f. o. b. Seller's plant site," by loading the same into railroad cars, and consigning the cars in such manner and by such routings as the buyer shall have designated; and that the buyer would pay the seller, on or before the 15th day of each month, without discount, for all coke delivered under the contract during the preceding calendar month.

However, the entire controversy between the parties arose out of a provision in the contract that the sulphur content of the coke shall not be more than 1.75% by weight, dry basis.

Laboratory tests made by the defendant on coke delivered to it by the plaintiff (and not disputed by the plaintiff) showed, on a monthly basis, sulphur content ranging from 1.39% to 1.60%, by weight, dry basis, for an annual average of 1.43% during 1957, sulphur content ranging from 1.45% to 1.63%, by weight, dry basis, for an annual average of 1.52% during 1958, sulphur content ranging from 1.53% to 1.71%, by weight, dry basis, for an annual average of 1.61% during 1959, sulphur content ranging from 1.66% to 1.82%, by weight, dry basis, for an annual average of 1.71% during 1960, and sulphur content ranging from 1.66% to 1.89%, by weight, dry basis, for an annual average of 1.76% during 1961.

The results of laboratory tests of coke received by the defendant from the plaintiff during the months of January and February of 1962 are not shown in the record, but the plaintiff does not dispute the figures indicated in a letter from the defendant under date of February 23, 1962, which states, in the body thereof:

"Our contract for your production of petroleum coke at Duncan includes a maximum of 1.75% for sulphur content. This maximum has been exceeded on a regular basis during recent months. Our policy is to refrain from small and temporary arguments concerning day to day production of petroleum coke under contract to us. However, the trend to excessive sulphur content in the Duncan production is now so well established that it has become a serious matter to us, and we must call it to your attention.

"Our analyses of deliveries during August showed an average sulphur content of 1.86%. September deliveries showed an improvement to only slightly above the contract specification—1.78%. The October figure was 1.83%—again followed by an improvement to 1.78% in November. The December figure was 1.89%. There were again some indications of improvement during January, but recent weekly analyses are as high as 1.89%. All of these figures add up to a trend which we cannot ignore. We do assure you that it is not our desire to take formal and precipitant action; however, it does seem proper and advisable that we now protect ourselves against the principle of 'silence means consent' by saying that this letter must be considered a formal notification by Great Lakes of a breach of contract."

The reply to that letter, under date of February 27, 1962, was as follows:

"This will acknowledge your letter of February 23, 1962 pertaining to the quality of coke that is being shipped from our Duncan Refinery.

"We are getting into this matter immediately with our people to see what is

causing this change in the quality of coke. We want to assure you that we are doing everything possible to get this matter taken care of."

Laboratory tests made by the defendant of weekly composite samples (a composite of samples from each car) of coke received from the plaintiff at the defendant's coke yard at Enid, Oklahoma, during five-day weeks ending on Fridays (the results of which are not disputed by the plaintiff), showed the sulphur content by weight, dry basis, was as follows: For the weeks ending during March of 1962, 1.82%, 1.82%, 1.92%, 1.90%, and 1.68%, for an average of 1.86%; for the weeks ending during April of 1962, 1.74%, 1.78%, 1.88%, and 1.88%, for an average of 1.77%; for the weeks ending during May of 1962, 1.78%, 1.82%, 1.94%, and 2.00% for an average of 1.88%; for the weeks ending during July of 1962, 1.90%, 1.98%, 1.84%, and 1.80%, for an average of 1.88%; and for the weeks ending August 3rd, 10th, and 17th, 1.80%, 1.84%, and 1.88%.

The defendant paid the invoices for all of the coke received by it from the plaintiff from the inception of the contract through the month of July, 1962, as provided in the contract.

Under date of August 23, 1962, the defendant mailed to the plaintiff a letter stating: "Our contract for your production of petroleum coke at Duncan includes a permissible maximum of 1.75% for sulphur content. Your breach of the contract in respect to the maximum sulphur content was formally brought to your attention in our letter of February 23, 1962. A period of almost six months has since elapsed, and during this period our sulphur determinations have been as follows—based on weekly composite samples of receipts." Then, the letter sets forth the results of the laboratory tests of weekly composite samples from cars received during the weeks ending March 2, 1962, through August 10, 1962, as hereinabove set forth but without showing the monthly averages shown above. The letter then states:

"This has developed into an intolerable situation which we can no longer ignore. The long and pleasant relations between our two companies will assure you that GLC seeks a mutually fair and satisfactory solution. We hereby notify you that, until such a solution is reached, coke failing to meet the contract specification is being unloaded and held for your account and for your further instructions."

The plaintiff continued to ship the coke produced at its Duncan plant to the defendant at its Enid coke yard, until the refinery was closed down for regular maintenance on October 8, 1962. The plant was reopened on October 17, 1962, but the plaintiff did not deliver, or offer to deliver, any coke to the defendant subsequent to a shipment covered by a bill of lading dated October 9, 1962 (the day following the temporary closing of the plant), which was received by the defendant, at its Enid yard, on October 15, 1962, during the five-day week ending on October 19, 1962.

The report of laboratory tests of weekly composite samples, mentioned above (the results of which were not questioned by the plaintiff), also showed the sulphur content by weight, dry basis, for the weeks ending August 24th and 31st, 1.94% and 1.90%, making the monthly average for August, 1962, 1.87%; for the weeks ending during September of 1962, 1.88%, 1.90%, 1.88%, and 1.88% for an average of 1.89%; and for the weeks ending October 5th, 12th, and 19th (which included shipments received on October 15, 1962), 1.96%, 1.78%, and 1.94%, for an average of 1.89%.

Under date of November 1, 1962, the defendant mailed to Ucan Products Company, P. O. Box 381, Tulsa 2, Oklahoma (Sunray DX Oil Company's address at the time), a letter stating:

"We refer to the Coke Purchase Agreement entered into with you March 1, 1957. We notified you of your breach of this Agreement in our letter dated February 23, 1962, and we further discussed the resulting intolerable effects of

your continuing breach in our letter of August 23, 1962.

"Accordingly, we feel obliged to formally terminate this Agreement herewith by reason of your continuing breach.

"In this connection, please refer to your letter addressed to our Chicago office under date of September 21, 1962. We deny liability for your invoice of August 31, 1962—amount $154,569.85—and for all subsequent invoices.

"We will be glad to discuss with you suitable adjustments in respect to invoices heretofore paid by us for deliveries during the period from February 23, 1962 to August 23, 1962."

Although the samples for the defendant's weekly composite tests for sulphur content were taken from the railroad cars before the cars were unloaded, the results of the laboratory tests were not available until all of the coke involved in a weekly composite sample had been unloaded from the cars. As was its custom, the defendant unloaded all of the cars received by it during the months of August, September and October of 1962, into piles with coke received by the defendant from other sources, and sold coke from the common masses without regard to source. There was evidence that, at all times involved herein, the defendant had on hand in such commingled piles more coke than it had received from the plaintiff, which was of a quality equal to, or better than, that received from the plaintiff after July 31, 1962, and was ready and willing to use such coke in complying with any instructions that might have been given by the plaintiff. The defendant refused to pay for any of the coke received by it from the plaintiff during the months of August, September and October of 1962, and that is the coke involved in the plaintiff's action on the contract.

Plaintiff's vice-president in charge of manufacturing during the time involved herein testified that the Duncan coking unit was operated as a part of the Duncan refinery; that the operation of the coking unit is a continuous operation with the operation of the refinery; that the quantity of coke produced from day to day is about the same; that laboratory analysis for sulphur content of a composite sample, made up from an equal quantity of each day's production of coke over a period of time, would compare with the average of the results of laboratory analyses of the separate samples making up the composite sample involved; that the sulphur content of petroleum coke is controlled, basically, by the sulphur content of the crude oil being processed and of any purchased coker feed stock being used; that some crude oils tend to produce more sulphur in coke than other crudes do; that the sulphur content of coke produced at the Duncan plant in 1961 increased as compared to 1959 and 1960 because, in 1961, they started running more Tatum, Tussy, Palestine and Velma crudes and reduced the amount of purchased coker feed stock being used; that, upon resumption of operations on October 17, 1962, they removed Tatum and Tussy crudes from the refinery crude charge, reduced the amount of Velma crude in the charge, and started using additional outside coker feed stock, but, because of the time lag in getting crude through the crude units and coking unit feed tanks, the weekly average of sulphur content in the daily production samples did not drop to, or below, 1.75% until December of 1962; that they continued their efforts to produce coke having a sulphur content of not more than 1.75% through the month of March, 1963; and that they could have reduced the sulphur content below that shown by their laboratory tests of daily production during the period from October 17, 1962, through the month of March, 1963, by substituting outside coker feed stock or other crudes for two or three thousand barrels per day of Velma crude.

Plaintiff's laboratory tests on daily production, during the last-mentioned period, showed that sulphur content by weight, dry basis, during the period from October 17, 1962, through November 30, 1962, on a daily basis (without weekly or monthly averages being shown) ranged from a low

of 1.75% (on two days) to a high of 2.12% with 40 of the 45 readings being above 1.80%. The tests further showed that from December, 1962 through March, 1963 the daily, weekly and monthly averages of sulphur content was sometimes slightly less and sometimes a little in excess of 1.75%.

The plaintiff also introduced evidence as to the number of tons of coke produced at the Duncan plant, and sold to others, by the plaintiff during the period of time from October 17, 1962, through the month of May, 1966, the per-ton cost of production thereof, and the average net price received by the plaintiff for such coke.

We deem it more convenient to consider the defendant's appeal involving the trial court's judgment against the defendant on the plaintiff's action on the contract, before considering the plaintiff's appeal involving the trial court's judgment against the plaintiff on its action for damages for breach of the contract by the defendant.

The defendant contends, in its appeal, that the trial court erred in its finding and conclusion that the defendant accepted the coke delivered to it by the plaintiff during the months of August, September and October of 1962, and, therefore, waived the failure of such coke to meet the contract requirement concerning maximum sulphur content. The trial court determined the defendant to be liable under the contract for the contract price of the coke delivered during those months. The defendant argues that the undisputed evidence establishes that it clearly and unequivocally rejected such coke as not meeting the sulphur-content requirement of the contract, as it had a right to do, under the law, *for breach of the contract by the plaintiff*, and, therefore, is not obligated to pay for any of such coke.

The defendant argues that the contractual requirement that the coke would not contain sulphur in excess of a certain per cent was, in effect, a warranty and that it was error for the trial court to award the seller a judgment for such coke because it was not as warranted. The plaintiff, on the other hand, argues that the reference to the sulphur content in the coke to be delivered under the contract was merely descriptive of the subject matter of the contract (coke) and a delivery of such coke followed by the acceptance thereof by the buyer furnishes sufficient basis for a judgment in favor of the seller and against the buyer for the contract price of such coke.

Brown v. Davidson (1914), 42 Okl. 598, 142 P. 387, involved an action on a promissory note given by the purchaser of a colt being sold by description but without any express warranty as to anything. The purchaser pleaded failure of consideration, breach of warranty and false representations, and sought, and recovered, damages in excess of the indebtedness represented by the note. The purchaser complained that the colt, when delivered, did not come up to the description in the contract, but kept the colt and still had it at the time of the trial, two years after delivery. In reversing the judgment for the purchaser, this court quoted and applied the following statements from Benjamin on Sales, p. 798, § 918:

" 'When the vendor sells an article by a particular description, it is a condition precedent to his right of action that the thing which he offers to deliver, or has delivered, should answer the description. Lord Abinger protested against the confusion which arises from the prevalent habit of treating such cases as warranty, saying: "A good deal of confusion has arisen in many of the cases upon this subject, from the unfortunate use made of the word, 'warranty.' Two things have been confounded together. *A warranty is an express or implied statement of something which a party undertakes shall be a part of a contract, collateral to the express object of it.* But in many of the cases, the circumstance of a party selling a particular thing by its proper description has been called a warranty, and the breach of such a contract a breach of warranty; but it would be better to distinguish such cases as a noncompliance with a contract which a

party has engaged to fulfill; as, if a man offers to buy peas of another and he sends him beans, he does not perform his contract, but that is not a warranty; there is no warranty that he should sell him peas—the contract is to sell peas—and if he sell him anything else in their stead, it is a nonperformance of it." There can be no doubt of the correctness of the distinction here pointed out. *If the sale is of a described article, the tender of an article answering the description is a condition precedent to the purchaser's liability, and if this condition be not performed, the purchaser is entitled to reject the article, or if he has paid for it, to recover the price as money had and received for his use*; whereas, in case of warranty, the rules are very different, as will appear post. Book V, part II, chapter 2.' " (Emphasis supplied.)

The portions of this quotation which are emphasized above appear in the second, third and fourth paragraphs of the court's syllabus to that opinion. That case is cited, and these principles applied, in Emerson-Brantingham Implement Co. v. Ware et al. (1918), 71 Okl. 19, 174 P. 1066, Bower-Venus Grain Co. v. Norman Milling & Grain Co. (1922), 86 Okl. 152, 207 P. 297, and Hurley Gasoline Co. v. Johnson Oil Refining Co. (1926), 118 Okl. 26, 246 P. 438.

In the last-cited case, the purchaser, who had paid for the merchandise prior to receipt and inspection thereof, and had returned it to the seller for failure of the merchandise to meet the contract description, and received a refund of the money paid, was allowed to recover damages which naturally resulted from the seller's delivery of non-conforming merchandise.

As pointed out in Valley Refining Co. v. Rock Island Refining Co. (1934), 167 Okl. 266, 29 P.2d 117, a real warranty, whether express or implied, survives acceptance of the merchandise. But, in Brown v. Davidson, supra, this court held, in the fifth paragraph of its syllabus, that the purchaser of the colt had, by his acts and deeds, accepted the colt as meeting the contract description, and then held, in the sixth paragraph of its syllabus:

"Where there is no express warranty accompanying a description of personal property and the buyer, after inspection and full opportunity to examine accepts the property, he is estopped from afterwards claiming damages for failure to comply with the description."

Thus, it appears that what is sometimes, unfortunately, referred to as an implied warranty that merchandise delivered under an executory contract of sale describing the merchandise being sold will meet the description, does not survive acceptance of non-conforming merchandise, and that acceptance of the non-conforming merchandise, by failing to reject it within a reasonable time after the non-conformity is discovered, or should have been discovered, leaves the purchaser without any remedy, just as his acceptance of beans, when the contract required the seller to deliver peas, would.

■ From the above-cited cases, we conclude that, where a contract for the sale of personal property provides that the property shall meet certain specifications but does not contain an express warranty that the property delivered will meet such specifications, there is no warranty which will survive an acceptance of the property by the buyer, so that delivery of property which does not meet the contract specifications is not a breach of warranty but is a non-performance, or breach, of the contract, and the rules concerning the rights and duties of a buyer of personal property, in the event of a breach of warranty by the seller, do not apply.

■ We also conclude from those cases that, in such a situation, the buyer may escape liability for the contract price as to any property which, upon delivery and inspection, does not meet the contract specifications, and may recover any damages resulting from such non-performance, or breach, of the contract, as well as the purchase price if paid, if he rejects the

non-conforming property within a reasonable time after he discovers, or should have discovered, that it does not meet the contract specifications, but becomes obligated to pay the contract price and is left without any remedy *insofar as that property is concerned*, just as though the property complied with the contract specifications, if he fails to reject the property within such reasonable time, or otherwise accepts the property.

Under the stipulation of facts and undisputed evidence in the present case, the defendant never did return, or offer to return, to the plaintiff any coke which did not meet the contract specification concerning maximum sulphur content, although it did notify the plaintiff, by the letter of August 23, 1962, set forth above, that, as to all coke received after July 31, 1962, which did not meet that specification, it would hold the same for the plaintiff's account and instructions.

However, it is also very clear from the stipulation of facts and the undisputed evidence that—instead of holding any of such coke in such a way that it could be returned to the plaintiff, or otherwise disposed of for the account of the plaintiff, in accordance with any instructions which it might receive from the plaintiff under such notice—the defendant, following its usual and customary procedure concerning coke being delivered to it under contract, unloaded from the railroad cars into which it had been delivered at Duncan, Oklahoma, by the plaintiff as provided in their contract, all of the coke received from the plaintiff after July 31, 1962, and commingled it, in piles in its coke yard at Enid, Oklahoma, with coke received from other suppliers, in such a way that all of the coke in such piles lost its identity as to supplier, before learning the results of laboratory tests of samples taken from each car of coke so received from the plaintiff. The defendant thereafter sold coke from the resulting commingled masses, just as though it was the absolute owner of all of such coke and just as, apparently, it had handled all of

the coke which it had, prior to August 1, 1962, received from the plaintiff, and accepted, and paid for in accordance with the terms of the contract.

Furthermore, there is nothing in the record to suggest that the defendant, after so selling the coke involved, ever offered to account, in any manner whatsoever, to the plaintiff for any part of the proceeds of any of such sales. To say the very least, this is inconsistent with recognition, by the defendant, of the plaintiff's ownership of any of the coke involved in any of such sales.

It is unnecessary for us to determine whether or not, in a case of this kind, holding non-conforming merchandise for the account and instructions of the seller, and notifying the seller of the intention to do so, without returning, or offering to return, such merchandise to the seller at the seller's point of delivery under the contract, would be sufficient, under the law, to constitute a rejection of such merchandise which would relieve the buyer of any obligation to pay the contract price for such non-conforming merchandise. The buyer in the present case, after giving such a notice, exercised dominion over all of the non-conforming merchandise, sold it, and did not offer to account, in any manner, to the seller, for any part of the proceeds from such sales thereof, just as though it had not given such notice and just as though it was the absolute owner of the merchandise and the seller had no interest whatsoever therein.

The defendant argues that its act in selling the coke involved in the plaintiff's action on the contract, after commingling it, as received but before learning the results of laboratory tests as to sulphur content, with coke of equal, or better, quality received from other suppliers, was consistent with its duty, under the rule in the case of Bailey v. J. L. Roebuck (1929), 135 Okl. 216, 275 P. 329, as the buyer of personal property in a situation involving a breach of warranty, to mitigate its damages as much as possible. The rule in that case, as set forth in the syllabus there-

to, is that: "Where a buyer of personal property has suffered damages by reason of a breach of warranty in the property bought, the buyer must make reasonable exertions to render his injury as light as possible; and he cannot recover damages which could and would have been avoided had he performed his duty; but a failure on the part of the buyer to perform such duty goes only to the amount of recovery, and will not entirely defeat his right of recovery for damages resulting from such breach, and which could not have been avoided by the exercise of such duty."

As demonstrated above, warranty and breach of warranty are not involved where, as in the present case, personal property is sold by particular description but without an express warranty that the property delivered will meet the contract description. The cited case is not in point on the facts. The defendant cites no authority, and we have found none, under which the buyer of personal property by description or specifications but without an express warranty that the property delivered will meet the contract's description or specifications would be required, or even authorized, to sell rejected non-conforming property for the purpose of mitigating any damages resulting from the delivery of such non-conforming property. Furthermore, this defendant's failure to allege, or pray for, or even attempt to prove, any damages resulting from the plaintiff's delivery of the coke involved in the plaintiff's action on the contract instead of coke meeting the contract requirement concerning maximum sulphur content, particularly when coupled with the defendant's complete failure to account, or even offer to account, in any manner whatsoever to the plaintiff, for any part of the proceeds of any of its sales involving that coke, completely nullifies any idea that any of such sales were made for the purpose of mitigating damages resulting to the defendant from the plaintiff's delivery of such non-conforming coke. We find no merit in this argument by the defendant.

The defendant points out that, under undisputed evidence, it would have been able, at all times pertinent herein, to comply with any instructions given by the plaintiff concerning the disposition to be made of the non-conforming coke received from the plaintiff after July 31, 1962, by using coke on hand in its Enid yard, which was of equal, or better, quality than the coke received from the plaintiff, and was ready and willing to do so. It argues that, in the particular circumstances (following the usual and ordinary custom in the trade of unloading coke as received, but after taking test samples from each railroad car, and commingling it with coke from any supplier before being able to learn the results of laboratory analyses of such test samples), it should not be penalized for not being able to restore the same coke to the plaintiff when it could have provided a substitute of equal or better quality, without any loss to the plaintiff.

However, in addition to the fact that there is nothing in the record to indicate that the defendant ever suggested such a substitution to the plaintiff, the cases hereinabove cited clearly indicate that the buyer of merchandise by particular description or specifications (where there is no express warranty that the merchandise delivered will meet the description or specifications) must either reject non-conforming merchandise, or accept it, and cannot do both as to the same merchandise. The defendant cites no authority (and we have found no authority) under which the seller of merchandise by particular description or specifications would be required, as a matter of law, to accept other merchandise, no matter how good, as restoration of non-conforming merchandise delivered to the buyer, just because treating the non-conforming merchandise as his own and making such a substitution would be more convenient for the buyer than handling it in such a way that it could be restored to the seller.

■ We hold that, where a contract for the sale of personal property provides that the property shall meet certain specifications but does not contain an express warranty that the property delivered will meet such specifications, rejection of property which has been delivered to the buyer but does not meet the contract specifications requires restoration of the same property to the seller (unless, of course, the seller is willing to accept some substitute therefor).

The trial court did not err in finding and concluding, in substance and effect, that, by its acts and deeds in connection with its handling of such coke, the defendant herein effectively accepted all of the coke involved in the plaintiff's action on the contract, as meeting the contract specifications, in spite of its rejection letter of August 23, 1962, and, therefore, became obligated to pay the contract price therefor.

The plaintiff's appeal herein (attacking the trial court's judgment against the plaintiff on its action for damages for breach of contract) is bottomed upon the theory that, since the defendant accepted all of the coke delivered to it by the plaintiff during the months of August, September and October of 1962, it waived its objections concerning the sulphur content of such coke and, therefore, was not entitled to declare a rescission or cancellation of the contract as to future deliveries of coke under the contract, on the ground that such August, September and October deliveries of coke did not meet the contract requirements concerning maximum sulphur content. Plaintiff concludes that the defendant's rescission or cancellation of the contract, by its letter of November 1, 1962, constituted an anticipatory breach of the contract by the defendant.

In order to reduce confusion as to the basic matter involved, and the proper principles of law applicable thereto, we note that, by its letter of November 1, 1962, the defendant did not purport or attempt to declare or to effect a "rescission" of the contract, as of its inception, but very clearly declared a "termination" of the contract as to the future [See: King et al. v. Oakley et al. (1967), Okl., 434 P.2d 868, 872]. Consequently, principles of law concerning rescission of contracts and the rights and duties of the contracting parties in connection with the rescission of a contract, are not, necessarily, applicable in this case.

Insofar as principles of law are concerned, we think that proper disposition of the plaintiff's appeal herein must be governed, primarily, by principles of law stated and applied by this court in Valley Refining Co. v. Rock Island Refining Co., supra, Waggoner Refining Co. v. Bell Oil & Gas Co. (1926), 117 Okl. 55, 244 P. 756, Consolidated Pipe Line Co. v. British American Oil Co. (1933), 163 Okl. 171, 21 P.2d 762, and that the situation involved in this plaintiff's action for damages for breach of contract is essentially the same as the situation involved in the Valley Refining Company case.

The Valley Refining Company case involved a contract wherein the plaintiff (Valley Refining Company) agreed to sell, and the defendant agreed to purchase, 35 tank cars (8,000 gallon capacity) of gasoline according to stated specifications, at an agreed price of 7.5 cents per gallon, with shipment to be made at approximately one car a day. The defendant received, accepted, and paid for, the first 15 cars of gasoline shipped by the plaintiff, although it learned during the time of delivery thereof, that the gasoline did not meet the contract specifications, and, during that time, notified the plaintiff that the product being shipped did not meet contract specifications, and demanded that, in future shipments, the plaintiff must comply with the specifications. The plaintiff continued to ship non-conforming gasoline and, after receiving 15 cars in all, the defendant canceled the contract and refused to receive the remaining 20 cars of gasoline. That plaintiff sued for damages for breach of contract based upon the defendant's alleged wrongful cancellation of the order and refusal to receive the remaining 20 cars of gasoline. This court affirmed the trial

court's judgment in favor of the defendant. In doing so, the court held, in its syllabus to the opinion:

"Where, under a contract for the sale of a given commodity of a specified quality, to be delivered to the purchaser by successive installments, goods of an inferior quality are delivered in the early installments, and the purchaser, though accepting the early installments, promptly complains of the defective quality thereof, and demands an observance of the terms of the contract, and the seller, notwithstanding such complaint, continues to ship defective goods, the purchaser is justified in assuming that the seller does not intend to abide by the terms of the contract and may cancel the same as to future installments."

That rule is based, in part, upon statements in paragraph 564 of the R.C.L. article on Sales (24 R.C.L. 284), quoted in the opinion:

" ' * * *. Thus if the default of the seller in the delivery of an installment is in the quality of the commodity delivered, and the installment has been accepted and retained by the buyer, the latter cannot *for such reason alone* repudiate the contract and refuse to accept further delivery of installments *of the required quality.* * * * It seems, however, that if the conduct and acts of the seller are such as to justify a reasonable belief on the part of the buyer that the seller intends thereafter to continue to tender or deliver a quality inferior to that required by the contract, the buyer may terminate the contract for such prior defaults.' " (Emphasis supplied)

In the body of the opinion in that case, this court noted that the principle recognized in the last-quoted statement from the R.C.L. text, above, was approved by the court in Waggoner Refining Co. v. Bell Oil Co. supra, in which it is held in the second paragraph of the syllabus:

" 'When it is made to appear that a seller does not intend to abide by the

terms of the contract of sale in a material particular, the purchaser will be excused from his obligation to perform,' " and also said: "Obviously the intention of the seller not to abide by the terms of the contract may be manifested by acts and deeds as well as words."

In Consolidated Pipe Line Company v. British American Oil Company, supra, which was an action by the purchaser of gasoline with certain specifications for damages resulting from the failure of the seller to deliver gasoline in accordance with the contract, this court, in affirming a judgment for the plaintiff-buyer, approved, as a correct statement of law, theretofore recognized in the Waggoner Refining Co. case, supra, the following excerpt from Williston on Contracts, volume 2, Section 855, page 1677:

" 'The same principle of justice which forbids the enforcement of a promise when the counter promise has been broken also forbids enforcement when it is evident that the counter promise will be broken. Prospective failure of consideration is as good an excuse as actual failure;' "

and said:

" * * *. We recognize the principle that one of the parties to a contract may, by positive statement or actions evidencing an intention not to perform, breach a contract before the time of performance has arrived."

In Waggoner Refining Co. v. Bell Oil & Gas Co., supra, in which this court affirmed the judgment of the trial court in favor of the defendant-purchaser in an action by the seller for damages resulting from the defendant's failure to receive and pay for 30 cars of gasoline pursuant to the terms of a written contract between the parties, it is held in the first paragraph of the syllabus:

"Before a seller may maintain an action for damages for breach of a contract on the part of the purchaser [by failure to receive and accept merchandise in accordance with the contract], he

must allege and prove an offer to deliver on his part, and a refusal to accept on the part of the purchaser, and that he has at all times stood, not only able, but willing and ready, to deliver the property in keeping with the terms of the contract."

We shall not discuss the contentions made by the plaintiff in its appeal in the same order in which they are presented in the plaintiff's briefs.

▬ In its third proposition, the plaintiff contends that the evidence does not establish that any coke delivered by the plaintiff to the defendant prior to the defendant's termination letter of November 1, 1962, did not meet the contract requirement concerning maximum sulphur content, but, even if it did, the evidence does not establish that the breach was so material as to warrant cancellation of the agreement by the defendant. Undisputed evidence establishes that, beginning some time in the year 1961, the sulphur content of many of the plaintiff's shipments of coke to the defendant was more than 1.75% by weight, dry basis—the average for that year was 1.76%; and that, for the most part, the sulphur content increased during 1962, so that the sulphur content of a majority, if not substantially all, of the plaintiff's shipment of coke prior to November 1st of that year, was more than 1.85% by weight, dry basis, with some of the shipments running as high as 1.92%, 1.94% and even 2.00%, and during only two of the weeks in that period the sulphur content of most of the coke did not exceed 1.75% by weight, dry basis. In the Waggoner Refining Company case, supra, this court said that the gasoline contract involved therein was what is denominated as a "mercantile contract," and held, in the third paragraph of its syllabus:

"Courts are not permitted to speculate as to whether a term employed in a mercantile contract is material, but must give effect to every term of the contract which the parties have chosen for themselves."

▬ Under that rule, we must assume that the parties intended for the contract provision involved in the present case to mean exactly what it says—that the sulphur content of the coke shall not be more than 1.75% by weight, dry basis, and that it is a material provision of the contract. The plaintiff's third proposition cannot be sustained.

The plaintiff's contention, in its second proposition, that the trial court erred in concluding that, as a matter of law, the plaintiff was required to plead and prove that it was able, as well as willing and ready, to deliver coke meeting the contract requirement, is answered by the first paragraph of the syllabus to the Waggoner Refining Company case, supra. Contrary to the plaintiff's contention (in the same proposition) concerning the evidence on that point, we think that, as found by the trial court, the plaintiff failed to establish that, at all times pertinent herein, it was willing and ready, as well as able, to deliver coke with a sulphur content of not more than 1.75% by weight, dry basis.

Based upon the trial court's finding that the defendant accepted all of the coke delivered to it by the plaintiff prior to November 1, 1962, the plaintiff contends, in its first and primary proposition, that, as a matter of law, by accepting such coke, the defendant waived any alleged defects in the quality thereof and, so, is precluded from asserting or relying upon any alleged failure of such coke to meet the contract specifications as the basis for its cancellation of the contract. In the same proposition, the plaintiff contends, as we understand it, that, even if it could be said that, by accepting such coke, the defendant, while waiving the defects in quality insofar as liability for that coke is concerned, it did not waive them insofar as future deliveries under the contract are concerned, the evidence does not disclose facts and circumstances which would justify a reasonable belief on the part of the defendant that the plaintiff intended to continue to tender or deliver coke not meeting the contract requirements, but negatives such a belief

or intent. From this, the plaintiff argues that the defendant's termination of the contract, based on alleged defective quality of the coke delivered prior to November 1, 1962, was unjustified and wrongful and constituted a prospective breach of the contract by the defendant.

■ We think that the plaintiff's continuing to deliver coke not meeting the contract requirement concerning maximum sulphur content, after the defendant's letter of February 23, 1962, hereinabove quoted, and even after the defendant's letter of August 23, 1962, hereinabove set forth, clearly would justify a reasonable belief on the part of the defendant that the plaintiff did not intend to abide by the terms of the contract. This brings the case within the rule stated in the first paragraph of the syllabus to Valley Refining Co. v. Rock Island Refining Co., supra, quoted above.

■ Assuming, without deciding, that, as contended by the plaintiff in its fifth proposition, notice of intention to terminate a sale contract for delivery of merchandise not in accordance with the contract description is required after the buyer has accepted installments which did not meet the contract description, we think (contrary to the plaintiff's further contention in the same proposition) that, particularly when considered together, the defendant's letters of February 23, 1962, and August 23, 1962, constituted sufficient notice of the defendant's intention to terminate the contract for the plaintiff's breach thereof, if the plaintiff continued to deliver coke which did not meet the contract requirement concerning maximum sulphur content of coke to be delivered under the contract.

■ In its fourth proposition, the plaintiff contends that a party to a contract who is himself in default cannot rescind or terminate the contract for the default of the other party. From this, it argues that, since, under the trial court's findings and conclusions, the defendant herein had accepted the coke delivered to it by the plaintiff during the months of August, September and October of 1962 and, thereby, waived any alleged defects in the quality of such coke, but refused to pay for any of such coke, the defendant was in default of payment under the contract at the time it declared the contract terminated, and, therefore, such termination was wrongful and constituted a prospective breach of the contract.

In each of the cases cited by the plaintiff under this proposition [Robberson Steel Co. v. Harrell and Stebbins (10 Cir.), 177 F.2d 12; Peter Fox Brewing Co. v. Collins (10 Cir.), 177 F.2d 1008; Shriver Oil Co. v. Interocean Oil Co., 157 Md. 341, 146 A. 223; Fairchild-Gilmore-Wilton Co. v. Southern Refining Co., 158 Cal. 264, 110 P. 951; and Presley v. Cooper (Tex.Civ. App.), 278 S.W.2d 237], the seller involved had rescinded or terminated, or was attempting to rescind or terminate, the contract for default on the part of the buyer which had been brought on by some breach or default on the part of the seller. In each case, the rule relied on by the plaintiff in the present case was applied against the seller. In the Robberson Steel Company case, the rule relied upon by the plaintiff herein is stated as follows: "The right to repudiate a contract for the default of the other party thereto cannot be exercised by a party who is himself in unexcused default of performance of an essential covenant thereof."

In the present case, it is unquestioned that the defendant's refusal to pay for the coke involved in the plaintiff's action on the contract (since determined, judicially, contrary to the defendant's theory, to constitute a default in payments due under the contract, as claimed by the plaintiff) was based upon the plaintiff's delivery of such coke instead of coke meeting the contract specification concerning maximum sulphur content. In the circumstances, we think that the defendant's default, *as of the time it declared a termination of the contract for breach of the contract by the defendant,* was not completely "unexcused," and that, to the extent, if any, that the cases

cited by the plaintiff under this proposition are in point in the present case, they are against the plaintiff, who first breached the contract and, thereby, brought on the defendant's default in performance under the contract.

As said by this court in the Valley Refining Company case, supra, quoting with approval from the case of Grafeman Dairy Company v. St. Louis Dairy Company, 96 Mo.App. 495, 70 S.W. 390 wherein the purchaser had cancelled a contract for successive deliveries of milk by reason of defective quality of prior deliveries): " 'In such circumstances, it is the party who furnishes the inferior goods who first breaches the contract; and when he manifests a determination to continue these breaches from day to day, the other party ought to be at liberty to rescind [more properly, "terminate," in such a case] the contract.' " And, in Hooper et al. v. Commercial Lumber Company (1959), Okl., 341 P.2d 596, 598, it is said: " * * * one party will not be permitted by his breach to create a condition which will tend to bring the other party in default and then assert that such party's rights are forfeited by a default so caused. 17 C.J.S. Contracts § 423, p. 910." We find no merit in the plaintiff's fourth proposition.

The trial court's judgment, as to both phases of the case, is affirmed.

IRWIN, C. J., BERRY, V. C. J., and DAVISON, BLACKBIRD, JACKSON, HODGES and McINERNEY, JJ., concur.

## SUPPLEMENTAL OPINION ON REHEARING

BERRY, Vice Chief Justice:

When the judgment involved was rendered our statute, 15 O.S.1961, § 274, provided all judgments of courts of record should bear 6% interest per annum. The instant judgment was entered July 29, 1966, including 6% interest until paid. By legislative enactment, effective March 25, 1968, the former statute was repealed and a new statute (15 O.S.Supp.1968 § 274) provided all judgments would bear interest at rate of 10% per annum from date of rendition.

On rehearing, directed against the opinion promulgated July 21, 1970, plaintiff in error prays modification of the opinion in respect to computation of interest upon the judgment. Basis for this claim is, in view of statutory change of rate of interest, the legal rate charged on this judgment should be computed under varying rates prescribed by changing laws. The precise inquiry is whether, when a judgment has been obtained bearing fixed interest rate under existing law, a change of that law by subsequent statute, either diminishing or increasing interest rate, will affect computation of the amount collectible under such judgment. It may be noted plaintiff in error's position is supported by some authority from other courts.

In 45 Am.Jur.2d, Interest and Usury § 74, the text states:

"In a number of jurisdictions, it is the rule, sometimes statutory, that if a contract has specified a lawful, conventional rate of interest, the same rate will prevail on a judgment rendered on the contract. Other authorities take the view that the obligation is merged in the judgment, and that the latter bears interest at the legal rate. * * *"

The varied results are observable in Linz v. Eastland County (Tex.Com.App.) 39 S.W.2d 599, 77 A.L.R. 1466, and Lawrence v. Am. Surety Co., 263 Mich. 586, 249 N.W. 3, 88 A.L.R. 535. The Texas court held the specified contract rate chargeable until date of judgment and the legal rate thereafter. The latter case points out the rule in Michigan is settled by statute that the contract rate is chargeable before and after judgment. The question does not appear to have been considered directly by this Court, although plaintiff in error's position is supportable under decisions of other courts.

Plaintiff in error cites Idaho Gold Dredging Co. v. Boise Payette Lumber Co., 54 Idaho 765, 37 P.2d 407; Swanson et al. v. Flynn, 75 N.D. 597, 31 N.W.2d 320; Peo-

ple ex rel. Atlantic, Gulf and Pacific Co. v. Miller, 173 Misc. 397, 17 N.Y.S.2d 202; Glades County, Florida et al. v. Kurtz (C.A. 5) 101 F.2d 759. Each cited case presented a situation in which the statutory interest rate on judgments had been reduced by subsequent legislative enactment. To support the conclusion in Boise Payette Lumber Co., supra, the Idaho court declared interest upon a judgment was not a matter of contract, but wholly statutory, and could bear interest only at the rate provided by law. Thus a court lacked power to provide for a rate of interest other than prescribed by statute.

The issue presented has been considered by a number of courts. In Wyoming National Bank v. Brown, 7 Wyo. 494, 53 P. 291, it was contended a judgment was a contract, and a rate of interest fixed by statute at time of rendition, could not be changed or modified by statute. That court held a judgment and statutory interest allowed did not constitute a contract in legal sense, and were subject to subsequent legislative enactment which reduced the prior rate of interest.

In Brauer v. City of Portland, 35 Or. 471, 60 P. 378, that court recognized irreconcilable conflict in decided cases as to whether a judgment is a contract within meaning of constitutional prohibition against legislative acts impairing obligation of contracts. The court held an amendatory act, which reduced rate of interest on money judgments from 8% to 6%, did not attempt to modify interest rate of judgments rendered prior to amendment, hence a trial court properly fixed interest at the original rate.

In Union Sav. Bank & Trust Co. v. Gelbach, 8 Wash. 497, 36 P. 467, that court held a county warrant unpaid upon presentation constituted a contract. And, the amendatory act reducing legal rate of interest from 10% to 8% did not apply to a warrant endorsed prior to amendment, since the rate of interest which a judgment bore was not reduced by the act, particularly since legislative act evidenced no such intention.

In Stanford v. Coram, 28 Mont. 288, 72 P. 655, that court held a statute changing interest rate which a judgment should bear after entry was not unconstitutional. Thus a judgment entered prior to legislative amendment bore 10% interest until effective date of the act and 8% thereafter. Basis for this holding was the decision in Morley v. Lake Shore, etc. Ry. Co., 146 U.S. 162, 13 S.Ct. 54, 36 L.Ed. 925.

In Morley, supra, the Supreme Court held a cause of action based either upon tort or contract not prescribing a rate of interest was not a contract in the ordinary sense when merged into a judgment. And, whether interest shall accrue upon a judgment is not a matter of contract but of legislative discretion. Interest is a penalty prescribed as liquidated damages for nonpayment of a judgment. When prescribed by statute, the owner of a judgment is entitled to, and has a vested right in, these damages up to time of legislative change. After legislative change the right is to receive such damages as the state chooses to prescribed. Dissent by Harlan, J. expressed the view that rights once acquired by legislative enactment cannot be destroyed by subsequent enactment because the judgment is a right or property, and legislature cannot violate this right without due process of law.

Within less than a year the Supreme Court decided Texas & Pac. Ry. Co. v. Anderson et al., 149 U.S. 237, 13 S.Ct. 843, 37 L.Ed. 717, involving interpretation of Texas law. The judgment involved had been entered at a time when the statute provided judgments should bear 8% interest. Subsequently (April 13, 1891) the statute was amended to provide judgments thereafter obtained should bear 6% interest. Without noticing Morley, supra, the court said, 13 S.Ct. p. 845, 37 L.Ed. p. 719:

" * * * and interest was properly included at the rate which obtained under the law of Texas at the time the judgment was rendered, the change in the

law in that respect operating only prospectively."

Section 274, supra, as originally existing was amended (Chap. 1, S.L.1968 p. 98) by S.B. 566, entitled:

"AN ACT RELATING TO JUDGMENTS; AMENDING 15 O.S.1961, § 274; PROVIDING THAT JUDGMENTS BEAR INTEREST AT THE RATE OF TEN PERCENT FROM DATE OF JUDGMENT: PROVIDING FOR SEVERABILITY: REPEALING CONFLICTING LAWS: AND DECLARING AN EMERGENCY."

Comparison of the former statute with § 274 as enacted 1968 discloses the new statute deleted "* * * and justices of the peace" from the body of the statute, and only changed "at the rate of six per cent per annum" to "at the rate of ten percent (10%) per annum."

A settled principal of statutory construction requires statutes be given prospective operation only, unless contrary legislative intent is expressed clearly, or necessarily implied from the language used. Consistent application of this rule, in respect to fact situations involving fixed rights accrued under statutes prior to amendment, may be observed in Board Trustees, etc. v. Kern, Okl., 366 P.2d 415, and Stagg v. Board Trustees, etc., 147 Okl. 172, 296 P. 417.

Nothing in the language used either plainly states an intention the new statute shall operate retrospectively, or by necessary implication requires such construction. Petition for rehearing, and Motion To Modify Judgment in respect to interest upon the judgment denied.

IRWIN, C. J., and DAVISON, WILLIAMS, BLACKBIRD, JACKSON, LAVENDER and McINERNEY, JJ., concur.

HODGES, J., dissents.